**No. 26-2040**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

The Sustainability Institute, *et al.*,

Plaintiffs-Appellees,

v.

Donald J. Trump, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of South Carolina

**APPELLANTS' EMERGENCY MOTION
FOR STAY PENDING APPEAL BY AUGUST 21, 2026**

BRETT A. SHUMATE
  *Assistant Attorney General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................. 1

STATEMENT ....................................................................................................... 3

ARGUMENT .......................................................................................................10

I.      Plaintiffs Are Not Likely to Succeed in Defending the District
        Court's Order to Obligate More Than $1 Billion by September 30.......10

        A.      There Are No Available ECJ Funds Because Congress
                Rescinded Them..................................................................................10

        B.      The District Court's Vacatur Did Not Require EPA to
                Affirmatively Re-obligate Funds nor Would Such Relief Be
                Permissible..........................................................................................13

II.     A Stay Pending Appeal Is Warranted .......................................................22

CONCLUSION.....................................................................................................27

CERTIFICATE OF COMPLIANCE

## INTRODUCTION

Plaintiffs challenge the government's decision to terminate grants they previously received, including (for eight plaintiffs) approximately $63 million in grants under the Environmental and Climate Justice (ECJ) program. Last year, the district court ordered the government to restore plaintiffs' grant funding. This Court stayed and ultimately vacated those orders, correctly explaining that the district court lacks jurisdiction to enter relief "designed to enforce obligations to pay money pursuant to Plaintiffs' grants." *Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026). And Congress has now rescinded the funding underlying the ECJ program.

Now, the district court has ordered the government to re-obligate, by September 30, all ECJ funds that remain available (based on the court's cramped reading of Congress's rescission): more than $1 billion. In other words, after this Court provided relief from the district court's previous orders requiring the government to give plaintiffs $63 million in ECJ funds, and after Congress enacted a statute rescinding ECJ funding, the court has now ordered the government to give many grantees—necessarily including perhaps hundreds of nonparties—$1 billion in ECJ funds. That order is worse, not better, and it too should be stayed.

On the merits, the district court's order fails at every turn. Congress has rescinded the funding underlying the ECJ program, and so there are no available funds for EPA to use to re-award grants. The court's treatment of that rescission—in a single sentence in a footnote—reflects a remarkably thin reed on which to order EPA to obligate more than $1 billion in taxpayer funds that the political branches believe are better left unspent.

Beyond that, the court has badly misunderstood the effect of its "vacatur" of EPA's decision to terminate all ECJ grants. Such a vacatur wipes away the challenged action, but it does not compel any future action; in concluding otherwise, the court mangled normal APA principles and end-ran this Court's previous holding. Nor could the court have permissibly entered an injunction requiring EPA to obligate ECJ funds (even setting aside the rescission). Plaintiffs have failed to identify any enforceable statutory command to obligate ECJ funds, and any disputes about the Executive Branch's compliance with Congress's spending directions are properly left to be resolved between the political branches.

And the equities are worse. The district court has permitted eight plaintiffs—who this Court has already held have no statutory entitlement to receive ECJ funds and who previously received only approximately 2% of

2

available funds—to obtain an order requiring EPA to reimplement an entire program and obligate more than $1 billion of ECJ funds in two months. And it has done so notwithstanding the political branches' agreement that the ECJ program is not a worthwhile use of taxpayer funds.

A stay pending appeal is warranted. In addition, given the resource-intensive steps that would be required for EPA to comply with the district court's orders (including to the potential detriment of EPA's ability to comply with its other statutory obligations) by September 30, *see* App.44-50, we respectfully request that relief by **August 21.**

## STATEMENT

1. In 2022, Congress appropriated $2.8 billion for a new grant program called ECJ grants. *See* 42 U.S.C. § 7438. Congress provided that the EPA Administrator "shall use" the appropriated funds "to award grants" to eligible entities "to carry out" specified activities "that benefit disadvantaged communities, as defined by the Administrator." *Id.* § 7438(a)-(b). The funds appropriated by Congress were originally "to remain available until September 30, 2026." *Id.* § 7438(a).

2. President Trump issued several Executive Orders setting forth his Administration's priorities and instructing agencies to pause funding where

3

permissible to permit review of whether the funding aligns with those priorities. He also instructed agencies to terminate certain funding that did not align with those priorities where legally permissible.

As relevant here, one Executive Order instructs agencies to "pause the disbursement of funds" under two statutes—including the statute that originally appropriated ECJ funds. Exec. Order No. 14,154, § 7(a), 90 Fed. Reg. 8353 (Jan. 29, 2025). And another directs agencies to terminate "to the maximum extent allowed by law, all" "'equity-related' grants," Executive Order No. 14,151, § 2(b)(1), 90 Fed. Reg. 8339 (Jan. 29, 2025)—a concern relevant here because the ECJ statute requires that grants benefit "disadvantaged communities" and allows, among other permissible activities, "facilitating engagement" of such communities "in State and Federal advisory groups, workshops, rulemakings, and other public processes," 42 U.S.C. § 7438(b).

Pursuant to the President's Executive Orders, EPA paused the obligation and disbursement of funds under each ECJ grant. And in February 2025, the agency determined that the ECJ grants "should be terminated for policy reasons." App.18. Starting in March, EPA "began

4

terminating the grants," although terminations were hampered by "court orders in various cases." App.19.

At the same time, the Executive Branch began working with Congress to rescind the funding underlying the ECJ program, given that program's incompatibility with the Executive Branch's policy priorities. And on July 4, 2025, Congress provided that all "unobligated balances of amounts made available to carry out" the ECJ program "are rescinded." Pub. L. No. 119-21, tit. VI, § 60016, 139 Stat. 72, 156 (2025). After Congress enacted that rescission, EPA continued to process terminations of ECJ grants, and most grants were terminated shortly thereafter.

3. Plaintiffs in this case are "nonprofit organizations and local governments that were awarded or were subrecipients on 38 federal grants across various funding programs." *Sustainability Inst. v. Trump*, 165 F.4th 817, 821 (4th Cir. 2026). Plaintiffs sued to challenge the freeze or termination of their grants; they claimed that those actions violated the APA as well as constitutional provisions. *See id.* at 822-23. In April 2025, the district court concluded that the actions challenged by plaintiffs were unlawful and ordered the government "to restore Plaintiffs' access to grant funds immediately." *Id.* at 823-24 (alteration and quotation omitted). The

5

government appealed, and this Court stayed and ultimately vacated that relief. *See id.* at 821.

As to plaintiffs' APA claims, this Court explained that "the district court lacked jurisdiction to order" the government to restore plaintiffs' grants. *Sustainability Inst.*, 165 F.4th at 825. That is because such relief is effectively contractual relief, which the Tucker Act precludes district courts from awarding under the APA. *See id.* at 825-29. As to plaintiffs' constitutional claims, this Court concluded that those claims were effectively "recast statutory claims" rather than true "constitutional ones." *Id.* at 831. And because the relevant statutes did not "specifically prohibit[] the Government from freezing or terminating [plaintiffs'] grants," this Court concluded that plaintiffs' *ultra vires* statutory claims could not proceed. *Id.* at 833 (alteration and quotation omitted). The Court, however, "express[ed] no view" on plaintiffs' alternate theory that the government's actions were contrary to law because "the Government cancelled entire grant programs wholesale"; that theory, the Court explained, did not support the district court's injunction "focus[ing] on the freeze and termination of Plaintiffs' particular grants." *Id.* at 833-34 (alteration and quotation omitted).

6

4. On remand, plaintiffs pivoted to challenging (as relevant here) EPA's decision to terminate all ECJ-funded grants. Eight plaintiffs had previously received one or more grants funded through the ECJ program, totaling approximately $63 million—a little more than 2% of total ECJ funding. *See* App.30-33. Those grants were each terminated between July 24, 2025, and August 1, 2025. *See id.*

In plaintiffs' view, EPA's decision to terminate all ECJ grants was contrary to the statute establishing the program and directing that the Administrator "shall use" appropriated funds to make grants under the program. *See* 42 U.S.C. § 7438(b)(1). In June 2026, the district court granted partial summary judgment to plaintiffs. As relevant here, the court first concluded that plaintiffs' claim was not moot, notwithstanding Congress's rescission of ECJ funding. In a single sentence, the court stated that Congress "only rescinded funds which were unobligated at the time of the bill's passage." App.3 n.1. And the court concluded that some program funds remained obligated as of the statute's enactment on July 4, 2025, seemingly because some grants—including those involving plaintiffs—were not terminated until the following weeks.

7

On the merits, the district court concluded that EPA's decision to terminate all ECJ grants was arbitrary and capricious and contrary to law because, in the court's view, there was a statutory mandate to use the appropriated funds to make grants and operate the program. *See* App.8-11. The court thus vacated EPA's "guidance closing the" program. App.11. The court declined, however, to "enter a permanent injunction requiring EPA to implement the" program, stating that "the requested relief appears impractical." *Id.* (alteration and quotation omitted).

After the vacatur, the government informed plaintiffs that, although EPA would no longer rely on the vacated guidance, it did not intend to reimplement the ECJ program or make new ECJ grants before September 30. Plaintiffs then moved to "enforce" the judgment and "clarify" the relief provided. In that motion, plaintiffs requested that the district court make clear that EPA is required to comply with the statute's supposed mandate "for funds to be obligated to eligible grantees by September 30, 2026." App.38. In the alternative, plaintiffs requested that the court enter an injunction "compelling EPA to implement the [program] by obligating the funding to eligible grantees by September 30, 2026." App.40.

On July 22, the district court entered a short order granting plaintiffs' motion in part. The court described its view that its previous order "held that [program] funds must be made available through September 30, 2026," and that EPA's intended course of action reflected the agency's "defying this Court's prior order." App.13-14. The court thus "clarifie[d] that the EPA must comply with its statutory obligations to administer the [program] through September 30, 2026." App.14.

Given that combination of orders and plaintiffs' description of their view of the relevant statutory obligations, the government understands the district court to have ordered EPA to re-obligate to eligible grantees substantially all funds that were obligated as of July 4, 2025. That encompasses more than $1 billion that was originally awarded to potentially hundreds of grantees, including the eight relevant plaintiffs in this case. App.49-50.[1]

---

[1] The exact amount of available funds under the district court's interpretation of the rescission depends on multiple legal and factual contingencies, but it is well north of $1 billion. *See* App.43-44 (walking through EPA's calculations).

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I. Plaintiffs Are Not Likely to Succeed in Defending the District Court's Order to Obligate More Than $1 Billion by September 30

### A. There Are No Available ECJ Funds Because Congress Rescinded Them

As explained, Congress initially appropriated $2.8 billion to fund ECJ grants, and EPA issued approximately 300 grants. EPA then determined to terminate each grant and, while those terminations were ongoing, Congress rescinded all "unobligated balances of amounts made available to carry out" the ECJ program. 139 Stat. at 156. EPA has now terminated nearly every grant that was made with ECJ funds, thereby rendering the remaining funds originally attached to each grant unobligated. The moment each set of funds became unobligated, it was rescinded pursuant to Congress's directions.

Thus, no portion of the original ECJ appropriation remains available to be obligated to new grants. And "[i]t is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation"—or

10

order the obligation of funds "in the face of a rescission by Congress of the underlying appropriation." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992) (per curiam).

The district court did not take issue with most of these principles. The court did not dispute that funds originally obligated to a particular grant become unobligated when that grant is terminated. Nor did the court dispute that it had no power to order EPA to obligate funds that Congress has rescinded. Instead, the court concluded that funds remain available for EPA to award to new grantees entirely because, in the court's view, Congress "only rescinded funds which were unobligated at the time of the bill's passage" on July 4, 2025. App.3 n.1. The court thus apparently believed that funds obligated to grants terminated after (rather than before) July 4 remain available for re-obligation.

The district court's cramped view of the statute as effecting only a one-time rescission is incorrect. Congress provided that unobligated balances "are rescinded." 139 Stat. at 156. That unadorned use of the present tense ("are rescinded") creates a prospective, ongoing rescission applying not just to funds unobligated as of July 4, 2025, but also to funds that become unobligated "now and in the future." *Hicks v. Frame*, 145 F.4th 408, 419 (4th

11

Cir. 2025); *see also* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . words used in the present tense include the future as well as the present[.]"). That conclusion is particularly clear in the rescission context, where Congress can and does use express language when it wishes to specify that it intends to address only those balances that are unobligated as of the date of enactment. *Compare* Pub. L. No. 118-5, div. B, tit. 1, § 1, 137 Stat. 10, 23 (2023) ("Each rescission made by this title shall be applied to the unobligated balances for each applicable appropriation as of the date of enactment of this title.").

Context confirms that conclusion. As explained, EPA determined in February 2025 to terminate all ECJ-funded grants for policy-based reasons, and it began the process of executing those terminations in March 2025—a process that remained ongoing through the rescission. Against that backdrop, Congress's blanket rescission is naturally understood to express agreement with the Administration's policy determination to terminate the program. And that conclusion is reinforced by Congress's decision at the same time to rescind funding for approximately two dozen other environmental- or climate-related funding programs. *See* 139 Stat. at 154-57.

12

In that context, there is no plausible basis for the district court's apparent view that Congress wanted EPA to issue new grants to replace grants that it terminated after July 4. Nor is there any indication that Congress wished to treat the funds attributable to grants whose terminations happened to be processed shortly before July 4 differently from those whose terminations happened to be processed shortly after.

**B.     The District Court's Vacatur Did Not Require EPA to Affirmatively Re-obligate Funds nor Would Such Relief Be Permissible**

Even setting aside Congress's rescission, the district court's view that its orders require EPA to obligate more than $1 billion in the next two months is incorrect. Plaintiffs claimed that EPA's decision to terminate the ECJ program was contrary to the APA's requirements; the court agreed and vacated the guidance memorializing that decision. That vacatur effectively voids the guidance, but it does not impose any new affirmative obligations on EPA. Moreover, any such mandatory injunction would have to rest on conclusions about EPA's non-discretionary obligations that the court did not reach and that would be incorrect.

1. As the district court recognized, to bring a challenge under the APA, plaintiffs must identify a "final, discrete agency action" that forms the focus

13

of judicial review. App.8. Here, the court identified EPA's "guidance requiring a definitive closure of the ECJ Program" as the agency action. App.8-9. And because the court believed that action was unlawful, the court "vacate[d] this guidance." App.11.

The effect of that vacatur was limited: EPA's guidance no longer has legal effect and EPA may not rely on it. In other words, the vacatur has "re-establish[ed] the status quo absent the" guidance. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (per curiam). The vacatur, however, "neither compels nor restrains further agency decision-making." *Id.*; *see also National TPS All. v. Noem*, 166 F.4th 739, 760 (9th Cir. 2026) ("By its plain terms, a set aside does not affect the Government's future actions."); *Make the Rd. N.Y. v. Noem*, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) (statement of Millett & Childs, JJ.) (similar).

Thus, the district court's vacatur affected only EPA's ability to rely on the vacated guidance moving forward. Properly understood, it did not require EPA to take any specific new actions—and it certainly did not require EPA to re-obligate $1 billion based on the court's own interpretation of the underlying statute and the scope of Congress's rescission. Of course, if plaintiffs believe that EPA's actions moving forward violate the relevant

14

statutes, they "may challenge the sufficiency" of those actions through a new claim, which would be evaluated in the first instance through the APA standards applicable to that claim. *Asylumworks v. Mayorkas*, 2023 WL 2733722, at *6 (D.D.C. Mar. 31, 2023). But plaintiffs may not leverage the court's "less drastic remedy" of vacatur, *Texas*, 40 F.4th at 219 (quotation omitted), to obtain what is effectively a backdoor affirmative injunction.

That principle is particularly important in this context given the limitations that Congress has placed on district courts' review of contract-based claims. As this Court explained in vacating the district court's first attempt to require EPA to restore plaintiffs' grant funding, the Tucker Act precludes plaintiffs from using the APA "to enforce obligations to pay money pursuant to" grants. *Sustainability Inst. v. Trump*, 165 F.4th 817, 825 (4th Cir. 2026). Although the Supreme Court has permitted plaintiffs to use the APA to seek vacatur of higher-level "agency guidance" even when that guidance relates to grants, such a vacatur "does not reinstate terminated grants." *NIH v. American Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring). And courts must be wary of plaintiffs' attempt to "end-run" Congress's limits on APA jurisdiction "by packaging" challenges to grant terminations "with a challenge to agency guidance." *Id.* at 2661-62.

15

Here, the district court's vacatur of EPA's higher-level policy guidance may be consistent with *NIH*. But to avoid end-running the Tucker Act (not to mention this Court's earlier decision), the effect of that vacatur must be properly limited in accordance with normal APA principles. In interpreting its own vacatur to require EPA to affirmatively obligate funds, the court transgressed those principles. That is particularly evident given EPA's determination that it is "extremely unlikely" that it would be able to comply by making new awards before the deadline (and, indeed, that even compliance by way of reinstating previously terminated grants would be "extremely difficult"). App.49. Given that reality, plaintiffs may well have effectively received the exact relief that *NIH* and this Court's previous decision foreclose them from getting—in addition to broad relief that benefits other parties and would be improper for additional reasons, as discussed below. That result cannot stand.

2. The district court's misinterpretation of its vacatur as effectively a mandatory injunction requiring EPA to obligate funds is especially problematic in this case because the court could not have properly entered such an injunction. For one, the court never applied the rigorous standard applicable to such mandatory injunctions on the merits nor did the court

16

evaluate the equitable factors required to enter injunctive relief. And regardless, any conclusion by the court that such an injunction was warranted would have been erroneous.

To compel an agency to take a specific action, a court must first conclude that "an agency failed to take a discrete agency action that it is required to take." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted). Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunction is "normally limited to enforcement of a specific, unequivocal command"—that is, "the ordering of a precise, definite act about which an official had no discretion whatever." *Id.* at 63 (alterations and quotation omitted).

Here, the underlying statute contains no such specific, unequivocal command to obligate any (much less all) of the funds originally appropriated for the ECJ program (even setting aside Congress's more recent rescission). That statute appropriated $2.8 billion "to award grants" to eligible entities for specified activities. 42 U.S.C. § 7438(a)(1). But in general, Congress's "[a]ppropriation of a given amount for a particular activity constitutes only a ceiling upon the amount which should be expended for that activity." H.R. Rep. No. 81-1797, at 9 (1950). It does not constitute a command—much less

17

an unequivocal one—to expend all appropriated funds. *Cf. Train v. City of New York*, 420 U.S. 35, 43-44 (1975) (recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized"). Instead, to communicate such a command, Congress generally employs express and mandatory language—providing, for example, that the relevant agency must obligate "not less than" a particular amount for an identified activity. *See, e.g.*, Pub. L. No. 118-47, div. F, tit. VII, § 7032(a)(2), 138 Stat. 4680, 786 (2024); *id.* § 7036(a), 138 Stat. at 798.

The ECJ statute contains no such language. Nonetheless, plaintiffs have purported to locate the relevant command in § 7438(b)(1)'s language providing that the "Administrator shall use amounts made available" to "award grants" to eligible entities for specified activities. *See* App.37. But plaintiffs misread that language, which is best understood (consistent with appropriations' general nature as ceilings, not floors, on spending) not to require the Administrator to expend all available sums but instead to limit how the funds may be spent: EPA may use them only for the purpose of awarding grants to eligible entities to carry out the specified activities and, thus, may not obligate them to other entities or activities. And in any event, EPA here did use the funds to award grants; nothing in the statute plausibly

18

creates an additional obligation to re-award new grants when money became available following the grant terminations.

That conclusion is particularly evident given the wide-ranging—indeed, judicially unreviewable—discretion that Congress has provided the Administrator in awarding grants. As courts have consistently held, the decision how to allocate "funds from a lump-sum appropriation" is "committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (holding that *Lincoln*'s logic extends to all funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute).

The ECJ statute fits that paradigm. Thus, the statute makes clear that the Administrator may determine which activities "benefit disadvantaged communities," and the statute provides the Administrator with broad flexibility to exercise his discretion to allocate funds among many possible eligible entities and specified activities to best achieve that goal as he

19

understands it. 42 U.S.C. § 7438(b). In light of that substantial discretion, it is difficult to imagine that Congress would have intended to require the Administrator to expend all $2.8 billion, even if (for example) he did not believe that there were a sufficient number of worthwhile eligible projects to occupy the full amount. Or if, as happened here, EPA determined that continuing to fund climate-justice activities was altogether not a worthwhile use of taxpayer dollars.

Congress has separately addressed the issue of when the Executive Branch can decline to expend all sums appropriated in the Impoundment Control Act, which establishes a reticulated scheme between the political branches governing the expenditure of appropriated funds. That statute generally directs the President to notify Congress when he believes that appropriated funds should be rescinded, establishes procedures to ensure Congress may timely consider a bill to rescind such funds, and provides that funds contained in a notification "shall be made available for obligation" only once Congress fails to act on a rescission bill within 45 days after notification. *See generally* 2 U.S.C. §§ 683, 688.

It is that reticulated scheme—and not the language in the ECJ appropriation itself—that properly governs whether and when the Executive

20

Branch must make ECJ appropriations available for obligation (or, at least, would have properly governed that question in the absence of the rescission). And if Congress believed that EPA's actions were not in accordance with the Executive Branch's obligations under that scheme, Congress could determine how to respond to that perceived violation. But as the D.C. Circuit recently explained, that inter-Branch framework provides no room for third parties like plaintiffs to seek judicial enforcement of the Executive Branch's asserted obligations. *See Global Health Council v. Trump*, 153 F.4th 1, 17-20 (D.C. Cir. 2025) ("[I]t does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits to enforce the [Impoundment Control Act] at any time and without notice to the Congress of the alleged violation.").

Thus, even setting aside Congress's rescission of the underlying appropriation, the statute here does not contain any mandatory, unequivocal command enforceable by plaintiffs that requires EPA to re-obligate all appropriated ECJ funds before September 30. Thus, the district court could not have properly entered any mandatory injunction requiring that result, even if he had considered plaintiffs' request that he provide such relief.

21

## II.    A Stay Pending Appeal Is Warranted

The remaining factors—irreparable harm, the balance of equities, and the public interest—overwhelmingly favor the requested stay.

1. The district court's preliminary injunction risks irreparable harm to the government and to the public interest by requiring the obligation of more than $1 billion that the government may never recover. As in *Department of Education v. California*, the government "is unlikely to recover the grant funds once they are disbursed." 604 U.S. 650, 651-52 (2025) (per curiam). Plaintiffs have not "promised to return withdrawn funds should [their] grant termination[s] be reinstated." *See id.* at 652 (quotation omitted). Nor is there any reason to believe that the many third parties who would necessarily receive funds under the district court's order would return that money either. Thus, if the government is forced to obligate and ultimately disburse funds while the court's order is in place, it may well be left with no meaningful recourse to reclaim them even if it prevails. The resulting harm to the government and the public fisc is plainly enormous.

That harm is compounded by the order's interference with the President's and Congress's ability to implement their own preferred policies. As explained, the government terminated ECJ grants because those grants

22

conflicted with the Administration's policy priorities. And Congress expressed its agreement with that policy determination by rescinding the funding underlying the program. The district court's order requiring the government to expend money running a grant program that is inconsistent with the political branches' own policy objectives inflicts a severe separation-of-powers harm. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And that harm is magnified by the fact that, given the timing of the court's order and the September 30 deadline, EPA may well not be able to conduct a prudent grant process and exercise its policy discretion to award new grants to eligible grantees who most align with the agency's priorities. *See* App.49. Even the court recognized that an order requiring EPA to implement the program anew would be "impractical," before turning around and, without explanation, entering exactly that order. App.11.

Beyond those monetary harms, the order also places an extreme administrative burden on EPA. As EPA has explained, complying with the order would require reimplementing an enormous grant program—one that the agency previously "charged a total of 218 full-time equivalents" in staff over the life of the program. App.45. Hiring the necessary staff and contractors to responsibly implement the program and using agency

23

resources to obligate more than $1 billion in funds in the next two months would be an enormous strain and would likely affect "EPA's ability to meet other statutory obligations, as well as timely obligate appropriated funds other than those at issue in this case." *Id.* Conversely, re-obligating funds without the necessary staff and contractors in place "to provide recipients with necessary communication regarding oversight and logistics" would be "imprudent and impractical." App.50.

2. By contrast, plaintiffs' countervailing interest in the district court's order is relatively minimal. As this Court previously explained, the underlying statutes plainly "do not require" that plaintiffs "themselves receive any funds." *Sustainability Inst.*, 165 F.4th at 833. And to the extent that plaintiffs' grant agreements generated an enforceable interest in funds that the government has violated, plaintiffs may seek damages in the Court of Federal Claims. The possibility of that remedy significantly undercuts any interest plaintiffs could claim in the district court's injunction.

The mismatch between plaintiffs' interests and the district court's order is even more extreme when considering the scope of each. Even before the ECJ grants were terminated, plaintiffs had received only approximately $63 million in grant funding, *see* App.50—little more than 2% of the funds

24

originally available. The court has now ordered the government to re-obligate more than $1 billion in funds, almost all of which will necessarily go to nonparties. The court nowhere even attempted to explain how, as an equitable matter, plaintiffs could leverage their asserted interest in a small minority of the available funds into an order requiring EPA to obligate all of them. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (making clear that federal courts sitting in equity may provide, at most, "complete relief *between the parties*" rather than relief to nonparties, and that even that complete relief is a ceiling, rather than a floor, on the relief available (quotation omitted)).

The inequitable consequences of that order are only underscored by the fact that many more ECJ grantees than the eight plaintiffs here are pursuing their own separate suit, in which they have so far not secured any relief. *See* App.50; *see also Appalachian Voices v. EPA*, 2026 WL 2089710, at *1 (D.C. Cir. July 21, 2026) (per curiam) (vacating dismissal on the merits of ECJ plaintiffs' claims and remanding for district court to consider whether claims were moot in light of Congress's rescission). Particularly given the limited practical avenues for EPA to comply with the district court's order,

25

this district court has now effectively provided the *Appalachian Voices* plaintiffs with the exact relief they have failed to obtain in their own suit.

As explained, this Court should stay the district court's order in full. At an absolute minimum, though, this Court should stay the district court's order to the extent that it applies beyond the relatively limited pool of funds that had been originally obligated to plaintiffs' grants. Even as modified, that order would be unjustifiable on the merits and on the equities, but it would at least limit the harm to be consonant with plaintiffs' own asserted interest in an extremely minor share of the former ECJ program.

26

## CONCLUSION

For the foregoing reasons, the Court should stay pending appeal the district court's injunction by August 21, 2026.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRYAN P. STIRLING
  *United States Attorney*

DANIEL TENNY

*/s/ Sean R. Janda*

SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2026

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5198 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA

# APPENDIX

# TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order (Dkt. No. 217) ....................................... App.1

Order (Dkt. No. 227)................................................................................. App.13

Order (Dkt. No. 234)................................................................................. App.15

Declaration of Travis Voyles (Dkt. No. 147-4) (excerpted) ..................... App.17

Declaration of Gregg A. Treml (Dkt. No. 205-2)....................................... App.27

Motion to Enforce Judgment (Dkt. No. 218).............................................. App.34

Declaration of Travis Voyles (Dkt. No. 232-1) .......................................... App.42

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| The Sustainability Institute, et al.,<br><br>                     Plaintiffs,<br><br>          v.<br><br>Donald J. Trump, in his official capacity as<br>President of the United States, et al.,<br><br>                     Defendants. | Case No. 2:25-2152-RMG<br><br><br>**ORDER AND OPINION** |

Before the Court is Plaintiffs' motion for partial summary judgment as to the Environmental and Climate Justice Block Grant Program ("ECJ Program") (Dkt. Nos. 204, 207). Defendants oppose Plaintiffs' motion and move to dismiss in part Plaintiffs' operative complaint. (Dkt. No. 205). For the reasons stated below, the Court grants in part and denies in part Plaintiffs' motion and denies Defendants' motion.

**Background**

Plaintiffs are eight nonprofit organizations and local governments who were each awarded grants under the ECJ Program. (Dkt. No. 204 at 9).

In 2022, the Inflation Reduction Act became law, amending the Clean Air Act by adding Section 138 and establishing the ECJ Program. (*Id.* at 10). Congress appropriated $2.8 billion to remain available through September 30, 2026. (*Id.*); 42 U.S.C. § 7438(a)(1). Section 138, codified at § 7438, states that the "Administrator shall use" the appropriated funds "to award grants." § 7438(b)(1).

In January 2025, President Donald J. Trump issued two Executive Orders: *Unleashing American Energy* and *Ending Radical and Wasteful DEI Programs and Preferencing.* (Dkt. No.

1

**App.1**

204 at 12). *Unleashing American Energy* directed agencies to "Terminat[e] the Green New Deal" and "pause the disbursement of funds appropriated through the Inflation Reduction Act." 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025). It also directed "all agency heads" to submit "a report to the Director of the [National Economic Council] and Director of [the Office of Management and Budget] that details the findings of [a] review" concerning "processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." *Id.* Section 2 describes the President's policy for "[u]nleashing American Energy." *Id.* at 8353-54. *Ending Radical and Wasteful DEI Programs and Preferencing* directed agencies to "terminate" all " 'environmental justice' offices and positions" and all "equity-related" grants or contracts. 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025).

On January 21, 2025, and January 27, 2025, the OMB issued memoranda interpreting *Unleashing American Energy*'s mandate to "[t]erminat[e] the Green New Deal." (Dkt. Nos. 23-5, 23-6). In particular, the OMB's January 27, 2025, memorandum ordered that "Federal agencies must temporarily pause" all grants related to "the green new deal." (Dkt. No. 23-6 at 3) (emphasis removed). That same day, Environmental Protection Agency ("EPA")'s Acting Chief Financial Officer Gregg Treml issued a memorandum "paus[ing]" "unobligated funds. . . appropriated by the Inflation Reduction Act of 2022." (Dkt. No. 23-8 at 2).

On or around February 25, 2025, EPA terminated "the entire ECJ Program." (Dkt. No. 204 at 13) (citing Dkt. No. 147-4 ¶ 3). In his declaration filed with the Court, Travis Voyles, Assistant Deputy Administrator, EPA, affirms that on February 25, 2025, he conducted an "individualized review of EPA grant programs" and "decided that certain grant programs," including the ECJ Program, "should be **terminated** for policy reasons." (*Id.* at 2-4) (emphasis added). That evening,

2

**App.2**

Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support, EPA, sent an email documenting Voyle's decision to terminate, inter alia, the ECJ Program. (*Id.* at 2-3, 5). As to the ECJ Program, the email specifically stated to "**[t]erminate grants** and pay final invoices." (*Id.* at 6) (emphasis added). The email also specified "[n]o new award actions." (*Id.*).

In late April 2025, Defendants disclosed to the Court that EPA had marked Plaintiffs' ECJ grants as "Closed," "Terminated," or "Termination in Progress." (Dkt. No. 204 at 15). EPA sent "boilerplate" termination letters to the ECJ Plaintiffs in late July 2025. (*Id.*).

Defendants do not contest that they terminated the ECJ Program. *E.g.*, (Dkt. No. 147-4 at 110) (Coogan declaration stating ECJ program was "to be terminated"); *see generally* (Dkt. No. 205 at 4) (admitting EPA terminated "each grant" awarded under the ECJ Program). Plaintiffs further contend that "EPA laid off the agency staff charged with administering the ECJ Program." (Dkt. No. 204 at 15). Defendants do not contest this factual assertion either. *See generally* (Dkt. No. 205).[1]

---

[1] To be precise, Defendants argue that the "One Big Beautiful Bill Act" (the "Act") rescinded the entire ECJ Program and that, therefore, this action is moot. (Dkt. No. 205 at 10-16). The argument is without merit. The Act only rescinded funds which were unobligated at the time of the bill's passage. *See* Pub. Law. No. 119-21, 139 Stat. 72 (July 4, 2025) ("The unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. § 7438) are rescinded."). Accordingly, the Court rejects Defendants' argument that Plaintiffs' ECJ-based claims are moot and must be dismissed. *See Maine Cnty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (observing "repeals by implication are not favored" and that "[t]his Court's aversion to implied repeals is 'especially' strong 'in the appropriations context' "). Further, even if Defendants' reading of the Act were correct, this would not affect Plaintiffs' request for declaratory relief, which became ripe on February 25, 2025, when Defendants illegally terminated the ECJ Program in violation of the Administrative Procedure Act.

3

**App.3**

2:25-cv-02152-RMG    Filed: 08/04/2026    Pg: 36 of 197

In their Supplemental Complaint for Declaratory and Injunctive Relief, as to the ECJ Program, Plaintiffs bring the following claims:

- Counts III, IV, and VII–Violation of the Administrative Procedure Act ("APA"). EPA's decision to terminate the ECJ Program violates 5 U.S.C. § 706(1)-(2).

- Counts I, II, and VI—Nonstatutory Review. The decision to terminate the ECJ Program is "ultra vires" and violates the "separation of powers."

Plaintiffs seek, inter alia, a declaratory judgment that the "executive actions taken to freeze or terminate" the ECJ Program violated the APA. (Dkt. No. 203 at 105-06). Plaintiffs affirm that "[v]acatur alone [of EPA's decision to terminate the ECJ program] should be sufficient to implement the ECJ Program, which the agency is under an ongoing statutory mandate to do." (Dkt. No. 204 at 37). Plaintiffs do not challenge in their amended complaint the termination of their individual ECJ grants nor seek reinstatement of their grants.

The parties' motions are fully briefed and ripe for disposition.

**Legal Standard**

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment has the burden of identifying the portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [which] show that there is no genuine issue as to any material fact and that the moving part is entitled to a judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 & n.4 (1986) (citing Rule 56(c)). The Court will interpret all inferences and ambiguities against the movant and in favor of the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Where the moving party has met its burden to put forth sufficient evidence

4

**App.4**

to demonstrate there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Rule 56(e)). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## Discussion

*The Court Has Jurisdiction Over Plaintiffs' APA Claims*

For the reasons stated below, the Court finds that it has jurisdiction to hear Plaintiffs' claim that EPA's guidance terminating the entire ECJ Program for "policy reasons" was unlawful.

A summary of *National Institutes of Health v. American Public Health Association* ("*NIH*"), 145 S. Ct. 2658 (2025) is necessary. This case involved a newly announced NIH policy, carried out through a series of guidance documents, "prohibit[ing] NIH from funding scientific research grants in certain categories," such as those "studies based on diversity, equity, and inclusion (DEI) and gender identity." *Am. Pub. Health Ass'n v. NIH*, 145 F.4th 39, 43, 45 (1st Cir. 2025). As a direct result of its new policy, NIH terminated hundreds of existing research grants. *See id.* at 45-47. Following a bench trial, the district court entered two orders, separately setting aside both the new policy and the resulting grant terminations as unlawful under the APA. *See id.* at 43-44. The First Circuit declined to stay the district court's orders pending appeal. *See id.* at 44.

NIH then applied to the Supreme Court for a stay. *See NIH*, 145 S. Ct. at 2659. The application was granted in part and denied in part, with Justice Barrett casting the deciding vote.

5

**App.5**

*See id.* In her controlling concurrence,[2] Justice Barrett explained that "the [d]istrict [c]ourt likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims (CFC)." *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). As for the APA challenge to the guidance itself, however, Justice Barrett explained that "the [d]istrict [c]ourt was likely correct to conclude that it had jurisdiction." *Id.* She observed that "[p]laintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court," and she reasoned that the fact "[t]hat the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* (omission in original) (quoting 28 U.S.C. § 1491(a)(1)). Justice Barrett also pointed out that "[v]acating the guidance does not reinstate terminated grants," making it appropriate to "channel[ ] challenges to the grant terminations and guidance to different forums." *Id.*

Courts have consistently followed Justice Barrett's concurrence, holding that they have jurisdiction to hear APA challenges in analogous or substantially similar factual scenarios such as those present here. *E.g.*, *Massachusetts v. NIH*, 164 F.4th 1, 12 (1st Cir. 2026) (applying Justice Barrett's concurrence to hold district court had jurisdiction to entertain challenge to agency guidance); *Pacito v. Trump*, 169 F.4th 895, 929 & n.15 (9th Cir. 2026) (applying Justice Barrett's concurrence to hold district court had jurisdiction to hear challenge to reinstate cooperative

---

[2] *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .' " (omission in original) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976))).

6

**App.6**

agreements); *Metropolitan Transportation Authority v. Duffy*, No. 25-cv-1413 (LJL), 2026 WL 588117, 23-26 (S.D.N.Y. March 3, 2026) (jurisdiction proper under *NIH* because, inter alia, claim was not contractual); *American Council of Learned Societies v. National Endowment for the Humanities*, No. 25-cv-3657 (CM), 2026 WL 1256545, *23-25 (S.D.N.Y. May 7, 2026) (applying Justice Barrett's concurrence to find jurisdiction over plaintiffs' claims under APA); *County of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1022-23 (N.D. Cal. 2025) (applying Justice Barrett's concurrence to find jurisdiction over plaintiffs' "challenge [to] Defendants' use of an unlawful agency policy to impose unlawful grant conditions [where plaintiffs sought] equitable relief to prevent Defendants from imposing unlawful conditions"); *President and Fellows of Harvard College v. United States Dept. of Health and Human Servs.*, 798 F. Supp. 3d 77, 105-08 (D. Mass. 2025) (jurisdiction proper under *NIH* as to agency guidance documents but not proper "as they pertain to the Termination Letters" because claims "based on the grant terminations must be brought in the Court of Federal Claims"); *Association of American Univs. v. Department of Defense*, 806 F. Supp. 3d 79, 91-92 (D. Mass. 2025) (applying Justice Barrett's concurrence to find jurisdiction over APA challenge to agency guidance).

The Court finds that it has jurisdiction to hear Plaintiffs' APA claim that Defendants' guidance terminating the ECJ Program was unlawful. Plaintiffs seek to vacate the "guidance documents" described above which shuttered the ECJ program despite Congress' mandate to the contrary. *NIH*, 145 S. Ct. at 2661 (denying Government "a stay of the judgements insofar as they vacate the guidance documents") (Barret, J., concurring); 42 U.S.C. § 7438 (appropriating $2.8 billion "to remain available until September 30, 2026, to award grants"); *Sustainability Inst. v. Trump*, 165 F.4th 817, 829 n.8 (4th Cir. 2026) (remanding to this Court to address the application of Justice Barrett's concurring opinion in *NIH*) (citing 145 S. Ct. at 2660-2662). In line with the

**App.7**

2:25-cv-02152-RMG    Date Filed 06/11/26    Entry Number 217    Page 8 of 12

numerous courts noted above and *NIH*, this Court likewise holds that it has "jurisdiction to entertain [Plaintiffs'] APA challenge to [Defendants'] guidance." *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

*Plaintiffs Are Entitled to Summary Judgment on their APA Claims related to the ECJ Program*

The APA allows the reviewing court to set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 763 (2004); *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014).

"[F]or an agency action to be deemed 'final' within the meaning of the APA and, thus, subject to the APA's requirement of a reasoned explanation, the agency 'action must be one by which rights or obligations have been determined, or from which legal consequences will flow.' " *QinetiQ US Holdings, Inc. & Subsidiaries v. Comm'r of Internal Revenue*, 845 F.3d 555, 560 (4th Cir. 2017) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

The challenged agency action must also be "discrete." *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019). "This requirement derives from the APA's definition of 'agency action,' which includes 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.' " *Id.* (citing 5 U.S.C. § 551(13)); *see also* 5 U.S.C. § 701(a)(2) (adopting the definition given in Section 551). "All five specific examples given in this definition are 'discrete' in character, and only actions that share this 'characteristic of discreteness' are reviewable under the APA." *Id.*

The Court finds that Plaintiffs challenge a final, discrete agency action. Plaintiffs have established that, contrary to Congress' will, the EPA issued guidance that shuttered the ECJ Program before its end date of September 30, 2026. *See* 42 U.S.C. § 7438(a)(1). The agency

8

**App.8**

guidance requiring a definitive closure of the ECJ Program was final and discrete—this guidance resulted in Plaintiffs' inability to participate in the statutorily mandated ECJ Program. In sum, the actions Plaintiffs challenge are reviewable. *See In re Aiken Cnty.*, 725 F.3d 255, 261 (D.C. Cir. 2013) ("[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill.").

Plaintiffs likewise have Article III standing.  To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 339. Because Plaintiffs here seek declaratory relief, they must establish an ongoing or future injury in fact. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

As noted above, ECJ funds must be made available through September 30, 2026. Plaintiffs have plausibly alleged a denial of an opportunity to apply for a benefit (grants). Plaintiffs have likewise shown—as explained *infra*—that EPA's guidance terminating the ECJ Program was

9

**App.9**

arbitrary and capricious and contrary to the law.[3] In sum, Plaintiffs have standing. *See CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) ("Under this line of authorities, a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity.").

Last, there is no doubt that Defendants' internal guidance terminating the ECJ Program in contravention of § 7438 was arbitrary and capricious and unlawful. Section 7438 appropriated $2.8 billion to remain available until September 30, 2026, "to award grants" such as those under the ECJ Program. Defendants' guidance closing and premature shuttering of the ECJ Program and refusal to administer it are illegal.[4] *See In re Aiken Cnty.*, 725 F.3d at 260 ("To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress.") (citing *Lincoln v. Vigil,* 508 U.S. 182, 193 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . .")); *Id.* at 258, 267 (granting mandamus where Nuclear Regulatory Commission "shut down

---

[3] This finding, it bears noting, could be independently relevant to any grant claims Plaintiffs bring before the CFC.

[4] In fact, Defendants previously admitted that they violated the APA but argued that this Court lacked jurisdiction to hear Plaintiffs' challenge to the termination of individual grants. (Dkt. No. 153 at 1) ("[F]or purposes of this case only, Defendants do not contest judgment on the merits of Plaintiffs' APA claims (excluding those asserted against the Secretary of Agriculture regarding grants under the Partnership for Climate-Smart Commodities ('PCSC'), see section II below), that would require Defendants to fund or negotiate grant agreements for 32 of the 38 grant awards at issue here. Defendants maintain their jurisdictional objections . . . ."). Further, in their current briefing, Defendants do not attempt to argue that the termination of the ECJ Program was legal. *See generally* (Dkt. No. 205).

**App.10**

its review and consideration of the Department of Energy's license application" in direct violation of federal statute and noting that "[i]t is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this case by the Nuclear Regulatory Commission").

Accordingly, the Court declares that the agency guidance closing the ECJ Program is illegal and vacates this guidance. § 706(2)(A); *Sierra Club v. United States Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018) (noting "Supreme Court has recognized that Section 706(2)(A) 'requires federal courts to set aside federal agency action' that is 'not in accordance with law' ") (quoting *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003)); (Dkt. No. 204 at 37) (averring that "[v]acatur alone [of EPA's decision to terminate the ECJ Program] should be sufficient to implement the ECJ Program").

The Court denies, however, the remainder of Plaintiffs' motion. Plaintiffs ask that the Court enter a permanent injunction "requiring EPA . . . to implement the ECJ Program," (Dkt. No. 204 at 37), a request which would presumably require ordering EPA to rehire and staff the ECJ Program. Plaintiffs likewise allude to an "equitable extension" of § 7438's September 30, 2026, deadline. (*Id.* at 38). Under the circumstances noted here, however, the requested relief appears impractical. Plaintiffs' request for a permanent injunction is therefore denied. Plaintiffs' request for mandamus is likewise denied.  Plaintiffs, however, are of course free to pursue their claims for alleged unlawful termination of their grants in the CFC. *See Department of Education v. California*, 604 U.S. 650, 651 (2025); *NIH*, 145 S. Ct. at 2659.

Last, the Court declines to address Plaintiffs' ultra vires/nonstatutory claims. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting ultra vires review is "unavailable if, as

**App.11**

is usually the case, a statutory review scheme provides persons 'with a meaningful and adequate opportunity for judicial review' ").

Should Plaintiffs move for an attorneys' fee award under 28 U.S.C. § 2412, the Court will address that motion at a later date.

### Conclusion

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment as to the ECJ Program (Dkt. No. 204) and **DENIES** Defendants' motion to dismiss in part (Dkt. No. 205).

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

June 11, 2026
Charleston, South Carolina

12

**App.12**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| The Sustainability Institute, et al., | Case No. 2:25-2152-RMG |
| Plaintiffs, | |
| v. | |
| | **ORDER** |
| Donald J. Trump, in his official capacity as President of the United States, et al., | |
| Defendants. | |

Before the Court is Plaintiffs' motion to enforce judgement and clarify. (Dkt. Nos. 218, 224). The Government opposes. (Dkt. No. 223). The Court grants the motion as follows.

Previously, the Court granted in part Plaintiffs' motion for partial summary judgment as to ECJ Program. The Court held that "Defendants' internal guidance terminating the ECJ Program in contravention of § 7438 was arbitrary and capricious and unlawful." *Sustainability Inst. v. Trump*, No. 2:25-2152-RMG, 2026 WL 1694522, at *5 (D.S.C. June 11, 2026). The Court vacated said guidance. *Id.* Further, in so ruling, the Court held that the Act "only rescinded funds which were unobligated at the time of the bill's passage." *Id.* at 2 n.1.

Plaintiffs now contend that the EPA has refused to comply with the Court's prior order. For example, while EPA acknowledges the Court vacated the guidance noted above, the EPA argues the Court's order "does not compel further action." (Dkt. No. 223 at 2). Further, even though the Government acknowledges that the Court's order held that ECJ Program funds must be made available through September 30, 2026, the Government persists in arguing that this is impossible because of the Government's contrary interpretation of the Act (*Id.* at 4). Said

1

**App.13**

differently, the EPA is defying this Court's prior order because of an interpretation of the Act which this Court specifically rejected.

The Court **grants in part** Plaintiffs' motion. (Dkt. No. 218 at 5). Namely, the Court clarifies that the EPA must comply with its statutory obligations to administer the ECJ Program through September 30, 2026. Further, the Court's interpretation of the Act is the law of the case, and the EPA may not flout the Court's prior order based on a legal argument which it advanced and the Court rejected.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

July 22, 2026
Charleston, South Carolina

2

**App.14**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |
|---|---|
| The Sustainability Institute, et al.,<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>Donald J. Trump, in his official capacity as President of the United States, et al.,<br><br>　　　　　　Defendants. | Case No. 2:25-2152-RMG<br><br><br>**ORDER** |

Before the Court is Defendants' emergency motion for stay pending appeal. (Dkt. No. 232).

The standard for granting a stay requires (1) "a strong showing" that the party requesting the stay will succeed on the merits; (2) the presence of irreparable injury by the party seeking the stay; (3) whether the stay will substantially injure other parties to the litigation; and (4) whether the public interest is served by the grant of the stay. *Nken v.* Holder, 556 U.S. 418, 434 (2009).

The Court **denies** Defendants' motion. Defendants have not made a strong showing that they will succeed on the merits, repeating arguments the Court has already considered and carefully rejected. (Dkt. No. 217); *see also* (Dkt. No. 227). In turn, Defendants cannot show irreparable injury. Rather, the stay will injure Plaintiffs, who cannot access the relief the Court ordered Defendants provide. *See* (Dkt. No. 217 at 11) (noting that "[v]acatur alone [of EPA's decision to terminate the ECJ Program] should be sufficient to implement the ECJ Program"); (Dkt. No. 227 at 2) ("[T]he Court clarifies that the EPA must comply with its statutory obligations to administer the ECJ Program through September 30, 2026."). Further, for those reasons, the public interest would not be served by granting the stay.

1

**App.15**

2:25-cv-02152-RMG    Date Filed 08/03/26    Entry Number 234    Page 2 of 2

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

August 3, 2026
Charleston, South Carolina

2

**App.16**

2:25-cv-02152-RMG     Date Filed 05/06/25     Entry Number 147-4     Page 1 of 111

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

|  |  |
|---|---|
| The Sustainability Institute, et. al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et. al.,<br><br>            Defendants | Civil Action No.: 2:25-cv-02152-RMG |

**DECLARATION OF TRAVIS VOYLES**

I, TRAVIS VOYLES, declare and state as follows:

1. I am an Assistant Deputy Administrator at the U.S. Environmental Protection Agency. The Assistant Deputy Administrator is the EPA official responsible for providing executive and logistical support for the EPA Administrator. I have held this position since January 2025. I make the following factual statements based on my personal knowledge and belief. If called as a witness, I could and would competently testify thereto.

2. The following is provided in response to paragraph 1 of the April 29, 2025, Court Order ("the Order"), specifically regarding:

- Grant #2 on Exhibit A to the Order, Grant #5F-03D33625-0 to Earth Island Institute, listed as "Termination in Progress";

- Grant #3 on Exhibit A to the Order, Grant #03D30824[1] to The Sustainability Institute, listed as "Termination in Progress";

- Grant #4 on Exhibit A to the Order, Grant #97T28301 to Leadership Counsel for Justice and Accountability, listed as "Termination in Progress";

---

[1] Exhibit A erroneously omitted a zero from the beginning of this grant number.

1

**Exhibit 4**

- Grant #5 on Exhibit A to the Order, Grant #96272300 to Bronx River Alliance, listed as "Termination in Progress";

- Grant #6 on Exhibit A to the Order, Grant #97T28901 to Earth Island Institute, listed as "Termination in Progress";

- Grant #7 on Exhibit A to the Order, Grant #00A01479 to City of New Haven, listed as "Termination in Progress";

- Grant #8 on Exhibit A to the Order, inadvertently identified as Grant #0E+00000 to the City of Madison, and therefore incorrectly listed as "Closed", and which should be listed as Grant #00E05005 to the City of Madison, and "Termination in Progress";

and

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven, listed as "Terminated";

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore, listed as "Terminated";

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, listed as "Terminated";

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, listed as "Terminated".

3. On February 25, 2025, I conducted an individualized review of EPA grant programs for consistency with Agency policy priorities. That day, I decided that certain grant programs, identified by "Assistance Number Listing," should be terminated for policy reasons. I orally communicated my decision to Daniel Coogan, Deputy Assistant Administrator for Infrastructure and Extramural Resources in the Office of Mission Support. That evening, Mr. Coogan sent an

2

**App.18**

email to me, copying others, documenting the decision I had made earlier that day. *See* Exhibit 1, Bates No. EPA_00289735.

4.    On March 7, 2025, Mr. Coogan sent an email to leadership in the EPA Office of the Chief Financial Officer instructing them to put a financial control in the Automated Standard Application for Payments (ASAP) system for the grants that had been identified for termination. In a separate email, I elaborated that the purpose of the control was "to prevent any drawdowns in the time between announcement and execution [of grant termination] through [the Office of Mission Support]." *See* Exhibit 2, Bates No. EPA_00048219.

5.    Later that day, staff in the EPA Office of the Chief Financial Officer executed my instructions, and sent an email back to their leadership with an attached excel spreadsheet verifying the programs they had subjected to the financial control, as well as a list of the individual awards for which drawdowns had been frozen as a result. *See* Exhibit 3, Bates No. EPA_00000735 and Exhibit 4, Bates No. EPA_00000739. Each of the grants listed in Paragraph 1 of this Declaration appears on that spreadsheet.

6.    Consistent with my instruction, throughout March, EPA began terminating the grants I had originally identified for termination on February 25, 2025, while noting the need to comply with court orders in various cases. *See* Exhibit 5, Bates No. EPA_00292053 and Exhibit 6, Bates No. EPA_00292054. Accordingly:

- Grant #9 on Exhibit A to the Order, Grant #00A01441 to City of New Haven was terminated on March 27, 2025;

- Grant #10 on Exhibit A to the Order, Grant #95336801 to City of Baltimore was terminated on March 26, 2025;

- Grant #11 on Exhibit A to the Order, Grant #03D03424 to CleanAIRE NC, was terminated on March 28, 2025; and

- Grant #12 on Exhibit A to the Order, Grant #96229424 to Bronx River Alliance, was terminated on March 28, 2025.

3

**App.19**

7. The process of terminating grants while remaining in compliance with court orders continues today. *See* Exhibit 7, Decl. of Daniel Coogan filed in *Woonasquatucket River Watershed Council et al. v. Department of Agriculture et al.*, 1:25-cv-00097 (D.R.I.), April 23, 2025, at para 5.

8. Accordingly, each of the grants identified in Paragraph 1 of this Declaration as "termination in progress" has not been terminated, and, as of the date of this Declaration, each of those recipients currently has access to draw down funding from ASAP.

9. In response to paragraph 4 of the April 29, 2025, Order, regarding Grant #15 on Exhibit A to the Order, Grant #0602.24.082555 to Alliance for the Shenandoah Valley, upon further review, that grant is not from the U.S. Environmental Protection Agency. Therefore, I have no information to provide regarding that grant.

10. In response to paragraph 5 of the April 29, 2025, Order, regarding Grant #8 on Exhibit A to the Order, as indicated in paragraph 1 of this Declaration above, Exhibit A erroneously identified the subject grant as Grant #0E+00000 to the City of Madison, and as a result incorrectly listed as the grant as "Closed." Upon further review, the grant at issue is Grant #00E05005 to the City of Madison, and its status is "Termination in Progress." Funds are currently available to the recipient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of May 2025.

/s/
TRAVIS
VOYLES

Digitally signed by TRAVIS VOYLES
Date: 2025.05.06 15:00:29 -04'00'

Travis Voyles
Assistant Deputy Administrator
United States Environmental Protection Agency

4

**App.20**

Message

| | |
|---|---|
| **From:** | /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7AA3C293E3F94FE6A0132382B42F0B23-DCOOGAN [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7AA3C293E3F94FE6A0132382B42F0B23-DCOOGAN] |
| **Sent:** | 2/25/2025 8:26:24 PM |
| **To:** | Voyles, Travis [voyles.travis@epa.gov]; Loving, Kathryn [Loving.Kathryn@epa.gov]; Jehling, Erica [Jehling.Erica@epa.gov] |
| **CC:** | Molina, Michael [molina.michael@epa.gov]; Patrick, Kimberly [Patrick.Kimberly@epa.gov] |
| **Subject:** | Next Steps on Grant Actions - Feb 25 |

Travis, just wanted to make sure we are all aligned on today's discussion and next steps. Below is the list of grant programs that require some action from OMS (for those that you cleared to continue operating, like Brownfields, I am not including them below and we will just communicate that direction separately with the programs and regions). The one caveat that I forgot to mention is that

**Deliberative Process**

# Deliberative Process

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title | Unawarded Grants | Grants Awarded Prior to October 1, 2024 | Grants Awarded After October 1, 2024 |
|---|---|---|---|---|
| 66.040 | Diesel Emissions Reduction Act (DERA) State Grants | Pause pre-award. OMS direct OAR to clear with OAR political leadership that pending actions align with administration priorities. | No change. | No change. |
| 66.049 | Clean Heavy-Duty Vehicles Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice | Cancel any unawarded/ unobligated actions and realign with administration priorities. | Confirm funding source before further action. | Confirm funding source before further action. |

**Exhibit A**
**App.21**

EPA_00289735

| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |
|---|---|---|---|---|
| 66.604 | Environmental Justice Small Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.616 | Environmental and Climate Justice Block Grant Program | Cancel any unawarded/ unobligated actions and decommit funding. | Terminate grants and pay final invoices. | No new award actions but hold on any terminations until further discussion with OGC. |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products | Cancel any unawarded/ unobligated actions and decommit funding. | No change. | No change. |
| 66.951 | Environmental Education Grants Program | Hold any unawarded/ unobligated actions to ensure compliance with Administration priorities. | No change. | No change. |

**App.22**

EPA_00289736

Message
_____

**From:**      Treml, Gregg [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6ED4CB59F9044E589BE621CBCBF9B0D4-C80321F4-31]
**Sent:**      3/7/2025 5:02:22 PM
**To:**        Voyles, Travis [voyles.travis@epa.gov]
**CC:**        Molina, Michael [molina.michael@epa.gov]
**Subject:**   RE: Place Hold/ Control in ASAP - 8 programs


Thank you.  Completing now.

Best,
-Gregg

Gregg Treml
Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov

---

**From:** Voyles, Travis <voyles.travis@epa.gov>
**Sent:** Friday, March 7, 2025 12:02 PM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** RE: Place Hold/ Control in ASAP - 8 programs

Thank you for checking.

Yes, this is the direction. We are proceeding with cancelling these grants and would like to prevent any drawdowns in the
time between announcement and execution through OMS.

--

Travis Voyles
C: (202) 787-0595

---

**From:** Treml, Gregg <Treml.Gregg@epa.gov>
**Sent:** Friday, March 7, 2025 12:00 PM
**To:** Voyles, Travis <voyles.travis@epa.gov>
**Cc:** Molina, Michael <molina.michael@epa.gov>
**Subject:** FW: Place Hold/ Control in ASAP - 8 programs

Travis,
Confirming this is your direction?

Thank you,
-Gregg

Gregg Treml

**Exhibit B**
**App.23**

EPA_00048219

Acting Chief Financial Officer
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 4402A WJCN
Washington, DC  20460
(202)-564-1151
treml.gregg@epa.gov

---

**From:** Coogan, Daniel <Coogan.Daniel@epa.gov>
**Sent:** Friday, March 7, 2025 11:53 AM
**To:** Treml, Gregg <Treml.Gregg@epa.gov>; Kadeli, Lek <Kadeli.Lek@epa.gov>; Jones-Peeler, Meshell <Jones-Peeler.Meshell@epa.gov>; Gulamali, Adil <Gulamali.Adil@epa.gov>
**Cc:** Patrick, Kimberly <Patrick.Kimberly@epa.gov>; Wise, Melissa <wise.melissa@epa.gov>
**Subject:** Place Hold/ Control in ASAP - 8 programs

All, we just had a check-in with Travis and as part of a broader effort related to certain grant programs, please put a control on ASAP accounts for all grants funded under the following grant programs so recipients cannot draw funds.

| CFDA/Assistance Number Listing | CFDA/Assistance Listing Title |
|---|---|
| 66.306 | Environmental Justice Collaborative Problem-Solving Cooperative Agreement Program |
| 66.309 | Surveys, Studies, Investigations, Training and Special Purpose Activities Relating to Environmental Justice |
| 66.312 | Environmental Justice Government-to-Government (EJG2G) Program |
| 66.604 | Environmental Justice Small Grant Program |
| 66.614 | Financial Assistance For Community Support Activities To Address Environmental Justice Issues |

**App.24**

EPA_00048220

| 66.615 | Environmental Justice Thriving Communities Grantmaking Program (EJ TCGM) |
| --- | --- |
| 66.616 | Environmental and Climate Justice Block Grant Program |
| 66.721 | Reducing Embodied Greenhouse Gas Emissions for Construction Materials and Products |

EPA_00048221

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| The Sustainability Institute, *et al.*, | Case No. 2:25-cv-02152-RMG |
| Plaintiffs, | **DECLARATION OF GREGG A. TREML** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

### DECLARATION OF GREGG A. TREML

1. I, Gregg A. Treml, hereby declare that the following statements are true and correct to the best of my knowledge, and are based on my personal knowledge, information acquired by me in the course of performing my duties, information contained in the records of the United States Environmental Protection Agency ("EPA" or "Agency"), and information supplied to me by EPA employees including employees under my direction. This declaration is filed in support of Defendants' Partial Motion to Dismiss, or in the alternative, for Summary Judgment, and Response in Opposition to Plaintiffs' Motion for Summary Judgment.

2. I am the Deputy Chief Financial Officer and Deputy Chief Administrative Officer in the Agency's Office of Finance and Administration ("OFA"). I have held this position since November 17, 2025. In this position, I am responsible for overseeing the Agency's annual budget, annual performance plans, financial operations, financial information systems, strategic planning and financial policy development efforts, human resources, and grants administration, among other things.

### The Working Families Tax Cut Act[1]

3. Section 138 of the Clean Air Act, 42 U.S.C. § 7438, appropriated funds to EPA "to

---

[1] Also known as the "One Big Beautiful Bill Act." Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025).

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                                    1

**App.27**

remain available" until September 30, 2026, to award grants for certain air pollution-related activities. Section 60016 (Rescission of Funding for Environmental and Climate Justice Block Grants) of the Working Families Tax Cut Act ("WFTCA") states: "The unobligated balances of amounts made available to carry out section 138 of the Clean Air Act (42 U.S.C. § 7438) are rescinded."

4.    In relevant part, an obligation is "[a] definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States." *See* Government Accountability Office ("GAO"), *A Glossary of Terms Used in the Federal Budget Process*, September 1, 2005.[2] An "unobligated balance," on the other hand, is "the cumulative amount of budget authority that remains available for obligation under law in unexpired accounts." OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 20 at 12 (August 29, 2025).[3]

5.    The Recording Statute, 31 U.S.C. § 1501, establishes the requirements for an agency to record an obligation of funds in its financial systems. In the non-formula grants context, 31 U.S.C. § 1501(a)(5)(B) states that "[a]n amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of . . . a grant or subsidy payable . . . under an agreement authorized by law[.]"

6.    A grant creates a legal duty on the part of the United States to make payments to the grantee for allowable costs incurred during the grant's period of performance. *See* GAO Decision No. B-300480, 2003 U.S. Comp. Gen. LEXIS 237 (April 9, 2003) (discussing obligational consequences of grants generally). EPA therefore treats grant agreements, including the ones at issue in this case, as recordable obligations.

---

[2] *Available at* https://www.gao.gov/assets/gao-05-734sp.pdf (last visited April 28, 2026).

[3] *Available at* https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf (last visited April 30, 2026).

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                                                2

**App.28**

2:25-cv-02152-RMG    Date Filed 05/05/26

7.    When a grant is terminated, EPA's legal obligation to the grantee is reduced from the full grant amount to only the grantee's allowable pre-termination costs, termination costs, and closeout costs. *See generally* 2 C.F.R. § 200.472 (discussing termination and closeout costs). Therefore, for the grants at issue here, at the moment of termination, the difference between the original full grant award and the amount due following termination became unobligated. And, because such unobligated funds were still in their available, unexpired period, those funds became immediately subject to the rescission of "unobligated balances" in the WFTCA § 60016.

8.    Notwithstanding that upon termination, such amounts become immediately, by definition, unobligated, *see supra* para. 4, and subject to the rescission, *see supra* para. 7, there is an administrative delay in executing both grant terminations and rescissions that causes a lag in EPA's financial systems.

9.    Specifically, when a grant is terminated, EPA is unaware of the exact amount the Agency still owes the grantee for allowable pre-termination costs, termination costs, and closeout costs. EPA will not know that information until the grantee submits its Final Financial Report, which can be submitted up to 120 days following grant termination, with the possibility of extensions. *See generally* 2 C.F.R. § 200.344 (discussing grant closeout procedures). Accordingly, EPA's financial systems may reflect that the full amount of the grant award is still recorded as "obligated" to the recipient for several months after termination. For that reason, for nine of the EPA grants at issue in this litigation, EPA's financial systems still show the full amount of the grant award recorded as "obligated" notwithstanding the fact that, at the moment of termination, all amounts in excess of the grantees' allowable pre-termination, termination, and closeout costs became "unobligated."

10.    Generally, EPA performs the ministerial bookkeeping act of "deobligating" any funds in excess of the Agency's actual legal obligation to the grantee, namely allowable pre-termination costs, termination costs, and closeout costs, at the conclusion of the grant closeout process, which marks when amounts owed to a grantee are finalized. Thus, there is a time delay between the legal act of

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                                                3

**App.29**

"unobligation" (effectuated by the termination) and the ministerial bookkeeping act of "deobligation" (adjusting EPA's recorded obligations to reflect the agency's true legal liabilities consistent with the Recording Statute, 31 U.S.C. § 1501). For two of the EPA grants at issue in this litigation, the grantees submitted their Final Financial Reports, and EPA completed the grant closeout process and "deobligation" action. Therefore, for those two grants, EPA's financial systems accurately reflect EPA's post-termination obligation, which was limited to allowable pre-termination, termination, and closeout costs. For both such grants, any amounts owed have been disbursed.

11.      Furthermore, for unobligated amounts subject to the indefinite rescission in WFTCA § 60016, EPA processes rescissions on available, unexpired balances in EPA's financial systems once-per-quarter. As a result, even after EPA adjusts its recorded obligations following completion of grant closeout, EPA's financial systems may still reflect available balances in the relevant account for some time until EPA executes the rescission on available, unexpired balances that were (ministerially) "deobligated" that quarter.

**Status of ECJ Plaintiffs'[4] EPA Grants**

12.      **The Sustainability Institute.** As of April 28, 2026, for The Sustainability Institute's Environmental and Climate Justice Block Grant ("ECJ") – Community Change grant (#03D30824), EPA's financial systems reflect an obligation of $11,396,020, which is the full amount of the original grant award. However, on July 28, 2025, EPA terminated the grant. Further, The Sustainability Institute has not submitted the Final Financial Report. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award, that amount does not reflect the final legal obligation that remains to The Sustainability Institute, which only includes allowable pre-termination, termination, and closeout costs.

---

[4] We are using the term "ECJ Plaintiffs" here as defined in Plaintiffs' Motion for Partial Summary Judgment ("MPSJ"). Dkt. No. 204, p. 9, footnote 3. This declaration will not address other non-ECJ grants that plaintiffs have raised in their supplemental complaint.

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                                    4

**App.30**

13.    **Bronx River Alliance.** As of April 28, 2026, for the Bronx River Alliance's Environmental Justice Collaborative Problem Solving ("EJCPS") grant (#96229424) and ECJ – Community Change grant (#96272300), EPA's financial systems reflect an obligation of $500,000 for grant #96229424 and $1,047,647 for grant #96272300, which are the full amount of the original grant awards. However, on August 1, 2025, EPA terminated both grants. Further, the Bronx River Alliance has not submitted Final Financial Reports for either grant. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award for both grants, that amount does not reflect the final legal obligation that remains to the Bronx River Alliance, which only includes allowable pre-termination, termination, and closeout costs.

14.    **City of Baltimore.** The City of Baltimore's ECJ – Government-to-Government ("EJG2G") grant (#95336801) was terminated on July 30, 2025. The City of Baltimore submitted its Final Financial Report for this grant on January 25, 2026. Following submission of that report, consistent with paragraph 10 above, EPA performed the ministerial act of "deobligating" any funds in excess of the Agency's final legal obligation to the grantee, namely the City of Baltimore's allowable pre-termination, termination, and closeout costs.

15.    **City of Madison.** As of April 28, 2026, for the City of Madison's ECJ – Community Change grant (#00E05005), EPA's financial systems reflect an obligation of $20,232,335, which is the full amount of the original grant award. However, on July 25, 2025, EPA terminated the grant. Further, the City of Madison has not submitted the Final Financial Report. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award, that amount does not reflect the final legal obligation that remains to the City of Madison, which only includes allowable pre-termination, termination, and closeout costs.

16.    **City of New Haven.** As of April 28, 2026, for the City of New Haven's EJG2G grant (#00A01441) and ECJ – Community Change grant (#00A01479), EPA's financial systems reflect an

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                                       5

obligation of $1,000,000 for grant #00A01441 and $20,000,000 for grant #00A01479, which are the full amount of the original grant awards. However, on July 29, 2025, EPA terminated both grants. Further, the City of New Haven has not submitted Final Financial Reports for either grant. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award for both grants, that amount does not reflect the final legal obligation that remains to the City of New Haven, which only includes allowable pre-termination, termination, and closeout costs.

17.    **CleanAIRE NC.** As of April 28, 2026, for CleanAIRE NC's ECJ – Community Change grant (#03D03424), EPA's financial systems reflect an obligation of $500,000, which is the full amount of the original grant award. However, on July 28, 2025, EPA terminated the grant. Further, CleanAIRE NC has not submitted the Final Financial Report. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award, that amount does not reflect the final legal obligation that remains to CleanAIRE NC, which only includes allowable pre-termination, termination, and closeout costs.

18.    **Earth Island Institute.** Earth Island Institute's ECJ – Community Change grants (#97T28901 and #03D33625[5]) were terminated on July 24, 2025, and July 28, 2025, respectively. As of April 28, 2026, EPA's financial systems reflect an obligation of $3,073,914 for grant #97T28901, which is the full amount of the original grant award. Moreover, the Earth Island Institute has not submitted the Final Financial Report for grant #97T28901. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award for grant #97T28901, that amount does not reflect the final legal obligation that remains to the Earth Island Institute for this grant, which only includes allowable pre-termination, termination, and closeout costs.

---

[5] Note, EPA's records reflect that grant #03D33625 was awarded to the West Anniston Foundation, a statutory partner of the Earth Island Institute.

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG                    6

**App.32**

With respect to grant #03D33625, as of April 28, 2026, EPA's financial systems reflect that this grant has been closed out, with the Final Financial Report received by EPA on January 8, 2026. Following submission of that report, consistent with paragraph 10 above, EPA performed the ministerial act of "deobligating" any funds in excess of the Agency's final legal obligation to the grantee, namely the Earth Island Institute's allowable pre-termination, termination, and closeout costs.

19. **Leadership Counsel for Justice and Accountability.** As of April 28, 2026, for Leadership Counsel for Justice and Accountability's ECJ – Community Change grant (#97T28301), EPA's financial systems reflect an obligation of $3,058,750, which is the full amount of the original grant award. However, on July 24, 2025, EPA terminated the grant. Further, Leadership Counsel for Justice and Accountability has not submitted the Final Financial Report. Therefore, consistent with paragraph 9 above, while EPA's financial systems temporarily reflect an obligation in the amount of the full grant award, that amount does not reflect the final legal obligation that remains to Leadership Counsel for Justice and Accountability, which only includes allowable pre-termination, termination, and closeout costs.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

GREGG TREML
Digitally signed by GREGG TREML
Date: 2026.05.05 11:07:39 -04'00'

Gregg A. Treml

DECL. OF GREGG A. TREML
2:25-cv-02152-RMG

7

**App.33**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| THE SUSTAINABILITY INSTITUTE, et al., | |
| Plaintiffs, | Case No. 2:25-cv-02152-RMG |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**MOTION TO ENFORCE JUDGMENT AND TO CLARIFY RELIEF ON PLAINTIFFS'**
**CLAIMS PURSUANT TO 5 U.S.C. § 706(1)**

In its Order and Opinion dated June 11, 2026, this Court held that Defendant EPA's "refusal to administer" the Environmental and Climate Justice Block Grant Program ("ECJ Program") is "contrary to Congress' will" and "illegal," and "vacate[d]" the agency guidance terminating the Program. Dkt. 217 at 10–11. This Order requires EPA to implement the ECJ Program as Congress mandated, which necessarily includes distributing appropriated funding by the statutory deadline of September 30, 2026. EPA nonetheless has informed Plaintiffs that it will not do anything to comply with its ongoing statutory obligations nor this Court's Order. Plaintiffs therefore seek further direction from this Court to enforce its judgment and, if necessary, to additionally order the relief Plaintiffs sought pursuant to 5 U.S.C. § 706(1) to compel agency action unlawfully withheld before the ECJ Program's statutory deadline of September 30, 2026. Plaintiffs have conferred with Defendants and they oppose this motion.

1

**App.34**

**Background**

In its recent Order and Opinion, this Court made clear that EPA's final agency action resulted in the illegal termination of the ECJ Program and that vacating the action would require reinstatement of the Program as Congress mandated. First, in determining that Plaintiffs had properly challenged a final agency action, the Court determined that EPA's action "resulted in Plaintiffs' inability to participate in the statutorily mandated ECJ Program." Dkt. 217 at 9. Citing *In re Aiken County,* the Court also stressed that "the President does not have unilateral authority to refuse to spend . . . funds" appropriated by Congress. *Id.* (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)).

The Court then held that pursuant to statute, "ECJ funds must be made available through September 30, 2026," *id.* at 9, and that "Defendants' guidance closing and premature shuttering of the ECJ Program and refusal to administer it are illegal," *id.* at 10. The Court twice quoted and relied on Plaintiffs' own brief averring that "[v]acatur alone [of EPA's decision to terminate the ECJ Program] should be sufficient to implement the ECJ Program." *Id.* at 4, 11.

Subsequent to this Court's Order, Plaintiffs' counsel conferred with counsel for EPA to discuss next steps in this case and to determine what actions EPA planned to take to comply with its statutory obligation to administer the ECJ Program. In a telephone call on June 18, 2025, EPA's counsel relayed that EPA has no plans to take any action whatsoever to implement the ECJ Program. On June 24, 2026, EPA's counsel confirmed this position in an e-mail stating that EPA "does not believe that any specific agency action is required to comply with the Court's vacatur." EPA indicated that it will not "make new grants" and will continue "the termination process for previously awarded grants." Ex. 1 (Email from J. Stroud sent Wednesday, June 24, 2026 at 2:54

2

**App.35**

PM). In other words, not only does EPA plan to continue defying its statutory mandate, but it also plans to take prospective steps based on an illegal and now-vacated policy decision.

## Argument

### A) The Court's Vacatur has Legal Consequences

Vacatur of a final agency action is not just a formality but rather is a remedy that entails meaningful consequences. *See, e.g.*, *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (effect of vacatur is to "automatically resurrect[]" the prior standard); *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148 (D.D.C. 2025) (vacatur of a Memo and Guidance required HHS to restore webpages and datasets that they had removed and modified in reliance on the guidance); *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018) (when a court vacates agency action, "the offending rule is rendered void and of no effect and there is a reinstatement of the rules previously in force" (citation, quotations, and alterations omitted)); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1054 (D.C. Cir. 2021) (discussing *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500 (D.C. Cir. 2019)); *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("[w]hen a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect and the agency must 'initiate another rulemaking proceeding if it would seek to confront the problem anew.'" (quoting *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987))).

As one court in this Circuit has explained, "[v]acatur of agency action is commonly understood to mean restoration of the status quo. The Fourth Circuit 'has defined the status quo as the 'last uncontested status between the parties which preceded the controversy.'" *Child Trends, Inc. v. United States Dep't of Educ.*, 795 F. Supp. 3d 700, 731 (D. Md. 2025) (quoting

3

**App.36**

*Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013)). As this Court already noted, vacatur of EPA's decision to terminate the grant program here is sufficient to require EPA to implement the ECJ Program in accordance with its statutory mandate. Dkt. 217 at 11. Specifically, EPA has a statutory obligation to implement the ECJ Program under Section 138 of the Clean Air Act, which commands that "the Administrator *shall* use amounts made available . . . to award grants . . . to eligible entities to carry out [specified activities] that benefit disadvantaged communities." 42 U.S.C. § 7438(b)(1) (emphasis added); *id.* § 7438(a)(1) (grantmaking funds have September 30, 2026 deadline).

EPA must comply with its statutory obligation to implement the ECJ Program. In *Child Trends*, for example, the district court agreed with the plaintiffs that "the proper remedy" was "restoration of the 'status quo' as encompassing the restoration of the [grant programs] in general, rather than restoring any specific grants," noting "Plaintiffs' proposed order reflecting that Defendants are required to 'obligate all funds that Congress made available under [the relevant statutes] before the appropriations to support each program expire' but not seeking the restoration of any particular grant." 795 F. Supp. 3d at 731. The consequence should be the same here. Instead, EPA has made clear it will resist this Court's Order by refusing to implement the ECJ Program or take any action to comply with the Court's Order. Accordingly, further action or clarification from this Court is required to prevent EPA from treating the Court's June 11 Order as a nullity.

Plaintiffs understand the Court's Order will assist them should they wish to seek damages in the Court of Federal Claims, but money damages are beside the point, not to mention of an uncertain amount and certainly years away. Plaintiffs are suffering ongoing injury from EPA's unlawful termination of the ECJ Program—the deprivation of any chance to participate in the

4

**App.37**

ECJ Program and deliver for their communities, *see* Dkt. 217 at 9–10—and those injuries must be redressed now. The interests of justice require that EPA not be allowed to immunize its illegal termination of the Program by running out the clock on its statutory obligations.

Likewise, Plaintiffs acknowledge that this Court did not issue the injunction they requested for practical reasons. *Id.* at 11. But the Court's order alone "should be sufficient to implement the ECJ program." *Id.* (quoting and relying on Plaintiffs' assertion). The Court explicitly declared that EPA's "premature shuttering of the ECJ Program and refusal to administer it are illegal" and vacated the guidance terminating the Program. *Id.* at 10. The lack of an injunction does not leave EPA free to disregard the Court's declarations and vacatur.

Plaintiffs respectfully request that the Court clarify that the absence of injunctive relief does not absolve EPA of its obligations pursuant to the vacatur of its termination guidance and the clear statutory mandate that remains in place. And while this Court expressed that it would not order EPA to re-hire staff to implement the ECJ Program, the absence of such an order should not be an impediment. EPA itself can best determine how to come into compliance with the mandate. All that the statute requires is for funds to be obligated to eligible grantees by September 30, 2026.

Plaintiffs respectfully request that the Court enforce its judgment and clarify that EPA must comply with its statutory obligations as a result of the Court's vacatur of its program termination guidance. This includes operating the ECJ Program, as well as ceasing to take future actions based on the now-vacated agency guidance.

**B) Plaintiffs are Entitled to Relief Pursuant to 5 U.S.C § 706(1)**

Plaintiffs also continue to seek formal relief pursuant to 5 U.S.C § 706(1). Plaintiffs requested this relief in their amended complaint, Dkt. 190-1 at 104, 107–08, and recent motion

**App.38**

for partial summary judgment, Dkt. 204 at 25–26, 36–37, 41, but the Court did not independently address the request in light of its holding on the Section 706(2) claim.

Specifically, Plaintiffs requested that this Court grant summary judgment on their claim under § 706(1) that EPA's ongoing failure to implement the ECJ Program constitutes "agency action unlawfully withheld," which the Court must "compel." 5 U.S.C. § 706(1); Dkt. 204 at 18-19. Plaintiffs cited *Norton v. Southern Utah Wilderness Alliance* for the proposition that "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." 542 U.S. 55, 65 (2004); Dkt. 204 at 18.

Plaintiffs further noted that when a party has successfully demonstrated an unlawfully withheld agency action under § 706(1), the Fourth Circuit instructs that "the court *must* enter an appropriate order and secure the agency's compliance with the law… regardless of equitable or policy considerations." Dkt. 204 at 36, *quoting South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) (emphasis added). *See also Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) (holding that when "Congress sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline. If it withholds such timely action, a reviewing court must compel the action unlawfully withheld.")

The Court has already made clear that EPA is legally required to take discrete actions within a certain time—namely, obligating the appropriated grant funds by the statutory deadline. Dkt. 217 at 10. And EPA has now made clear that it will not take such actions in response to the Court's June 11 Order. *See* discussion *supra* at 2-3. As such, Plaintiffs respectfully request this Court formally grant Plaintiffs' claim for summary judgment pursuant to 5 U.S.C. § 706(1) and

**App.39**

enter an order compelling EPA to implement the ECJ Program by obligating the funding to

eligible grantees by September 30, 2026.

Respectfully submitted, this 29th day of June, 2026.

/s/ Carl T. Brzorad
Carl T. Brzorad (S.C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW
CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

/s/ Kimberley Hunter
Kimberley Hunter (N.C. Bar No. 41333)
Irena Como (N.C. Bar No. 51812)
Nicholas S. Torrey (N.C. Bar No. 43382)
Ben Grillot (D.C. Bar. No. 982114)
Spencer Gall (V.A. Bar No. 95376)
SOUTHERN ENVIRONMENTAL LAW
CENTER
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1450
Facsimile: (919) 929-9421
kmeyer@selc.org
icomo@selc.org
ntorrey@selc.org
bgrillot@selc.org
sgall@selc.org

*Counsel for Plaintiffs The Sustainability
Institute, Bronx River Alliance, CleanAIRE
NC, Earth Island Institute, and Leadership
Counsel for Justice and Accountability*

/s/ Graham Provost
Graham Provost (DC Bar No. 1780222)
Elaine Poon (VA Bar No. 91963)
Jon Miller (MA Bar No. 663012)
Cassie Crawford (NC Bar No. 45396)

Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
graham@publicrightsproject.org

*Counsel for Plaintiffs Baltimore, Maryland;
Columbus, Ohio; Madison, Wisconsin;
Nashville, Tennessee; New Haven,
Connecticut; and San Diego, California*

/s/ Julie Rau
Julie Rau, Lead Deputy City Attorney
(CA Bar No. 317658)
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
(619) 533-5800
jrau@sandiego.gov

*Counsel for Plaintiff City of San Diego*

7

**App.40**

## CERTIFICATE OF SERVICE

I certify that on June 29, 2026, I electronically filed the foregoing with the Clerk of the

Court by using the Court's CM/ECF system.


/s/ Carl T. Brzorad
Carl T. Brzorad (S.C. Bar No. 105413)
SOUTHERN ENVIRONMENTAL LAW CENTER
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039
cbrzorad@selc.org

8

**App.41**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| The Sustainability Institute, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 2:25-cv-02152-RMG<br><br>**DECLARATION OF TRAVIS VOYLES** |

**<u>DECLARATION OF TRAVIS VOYLES</u>**

1.  I, Travis Voyles, hereby declare that the following statements are true and correct to the best of my knowledge, and are based on my personal knowledge, information acquired by me in the course of performing my duties, information contained in the records of the United States Environmental Protection Agency ("EPA" or "Agency"), and information supplied to me by EPA employees including employees under my direction.

2.     As Associate Deputy Administrator for the Agency, I am responsible for providing executive and logistical support for the EPA Administrator. I have held this position since April 2025.

3.     In its June 11, 2026, Order, this Court "declare[d] that the agency guidance closing the [Environmental and Climate Justice Block Grant (ECJ)] Program is illegal and vacat[ed] this guidance." (Dkt. No. 217 at 11).

4.     In its July 22, 2026, Order, this Court expressed its view that, in light of its previous vacatur, "EPA must comply with its statutory obligations to administer the ECJ Program through September 30, 2026." Dkt. No. 227 at 2. This declaration provides information regarding steps EPA has begun taking and/or would need to take to prudently and effectively "administer the ECJ Program."

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                1

**App.42**

**Identifying Amounts Available for Obligation**

5.      First, EPA would need to work with the Office of Management and Budget (OMB) to seek apportionment of funding that has been rescinded from EPA's financial systems.[1] The Antideficiency Act states in relevant part that an employee of the U.S. government may not make or authorize an obligation exceeding an apportionment from OMB. 31 U.S.C. § 1517(a). Therefore, before making any new financial obligations, EPA is legally required to obtain an apportionment.

6.      Since enactment of Section 60016 (Rescission of Funding for Environmental and Climate Justice Block Grants) of the Working Families Tax Cut Act (WFTCA), EPA has understood that statute to rescind not only balances unobligated as of the WFTCA's July 4, 2025, date of enactment, but also all balances that became subsequently unobligated (*e.g.*, as a result of later grant terminations). Treml Decl., Dkt No. 205-2. For that reason, between July 4, 2025, and April 11, 2026, at EPA's request, OMB executed quarterly rescissions for a total of $1,589,132,739.34 in ECJ funding from EPA's financial systems.

7.      Of the total $1,589,132,739.34 in ECJ funding that has been rescinded from EPA's financial systems, $479,450,776.11 was recorded as unobligated in EPA's financial systems on July 4, 2025. Therefore, as EPA understands the Court's June 11 and July 22, 2026, Orders, such approximately $479 million were rescinded consistent with the Court's holdings.[2]  Dkt. No. 217, Dkt No. 227. That

---

[1] In relevant part, an apportionment is "[t]he action by which the Office of Management and Budget (OMB) distributes amounts available for obligation, including budgetary reserves established pursuant to law, in an appropriation or fund account." Government Accountability Office, *Glossary of Terms Used in the Federal Budget Process* at 12 (Sept. 2005), *available at* https://www.gao.gov/assets/gao-05-734sp.pdf.

[2]  In addition to the approximately $479 million rescinded because it was recorded as unobligated on July 4, 2025, there is up to an additional $376 million that, in EPA's view, were legally unobligated as of July 4, 2025. Specifically, up to approximately $376 million recorded as obligated in EPA's financial system on July 4, 2025, may have been attributable to amounts that exceeded or may exceed (pending closeout) recipients' final allowable pre-termination, termination, and closeout costs for ECJ grants terminated prior to July 4, 2025. Therefore, in EPA's view, notwithstanding such amounts having been *recorded* as obligated, this up to approximately $376 million were also *legally* unobligated as of July 4, 2025, and would be properly rescinded. Treml Decl., Dkt No. 205-2. That amount is still fluctuating as closeouts continue.

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                    2

**App.43**

leaves approximately $1.109 billion that EPA would need to request for apportionment.

8.      Taking Paragraphs 5 through 7 above into account, the first step to "administer the ECJ program" is for EPA to request an apportionment from OMB so that EPA has the legal authority necessary to make new financial obligations in accordance with the Antideficiency Act, 31 U.S.C. § 1517(a). Considering the amount at issue and the need to perform due diligence on both the part of EPA and OMB, the Agency expects the reapportionment process to take several weeks.

9.      In addition, as of July 28, 2026, EPA's financial systems reflect $445,664,391.57 in recently deobligated ECJ funding due, in large part, to ongoing grant closeouts. Because such amount has not yet been rescinded from EPA's financial systems, apportionment by OMB is not legally necessary for EPA to make new financial obligations using those funds. Thus, EPA would add this approximately $450 million in recently deobligated funds to the $1.109 billion apportionment from OMB described in paragraph 8 above to for a total of approximately $1.56 billion. Furthermore, if ECJ grant closeouts continue, additional funds may become available for obligation.

10.     In total, as the Agency understands the Court's June 11 and July 22, 2026, Orders, once the Agency receives an apportionment of funds from OMB, EPA estimates the Agency would be restarting a grant program worth approximately $1.56 billion in the span of two months.

**Identifying Staff and Contractor Support Resources**

11.     During the prior presidential administration, the ECJ program was administered primarily by EPA's Office of Environmental Justice and External Civil Rights (OEJECR) and was staffed by employees in EPA Headquarters and the ten EPA regions. In 2025, as part of the Agency's reorganization efforts, EPA eliminated environmental justice offices agency-wide and removed OEJECR as a National Program Manager (NPM). Accordingly, EPA would need to assign the ECJ program to a new NPM to restart and otherwise implement the program. Making such a decision would likely require, in pertinent part, considering which other Agency work will be deprioritized to accommodate this new work, taking

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                    3

**App.44**

into account the fact that any decision is likely to impact EPA's ability to meet other statutory obligations, as well as timely obligate appropriated funds other than those at issue in this case. For example, as of July 28, 2026, EPA's financial systems reflect approximately $56 million in funding from the Agency's annual Environmental Programs and Management and Science and Technology appropriation accounts committed to grants that must be awarded before September 30, 2026, or the funds will expire and become unavailable for new obligations.[3] If EPA redirects resources away from awarding those grants to administering the ECJ program instead, some or all of those resources may ultimately be forfeited to expiration.

12.    While EPA could theoretically hire new employees and/or obtain contractor support to assist with administering the ECJ program without rediverting existing staff time and resources from other programs, such hiring and contracting is likely to take far more than the two months given by the Court's Orders to administer the ECJ Program. For example, over the life of the original $2.8 billion ECJ program, EPA charged a total of 218 full-time equivalents (FTE) in staff to the appropriation available for ECJ program administration. In Fiscal Year 2026, EPA hiring averages 87 days from the time a recruit is initiated to the time a tentative offer is made, and an additional 39 days until the employee is onboarded. The total time to hire averages 126 days. Additionally, for contractor support over the life of the original $2.8 billion ECJ program, EPA obligated a total of $97.5 million. Based on EPA's average procurement action lead times, which in large part are necessary to implement statutory and regulatory procurement requirements, acquiring new contractor support would likely take between 25 days at a minimum (if EPA was able to limit itself to micro-purchase simplified acquisitions of $15,000 or less while remaining consistent with 48 C.F.R. Part 13) up to 360 days for a fully competed contract award of over $10 million, with the latter being more the type of contract support typically needed to support a $2 billion program.

---

[3] In relevant part, a "commitment" is "[a]n administrative reservation of allotted funds, or of other funds, in anticipation of their obligation." Government Accountability Office, *Glossary of Terms Used in the Federal Budget Process* at 32 (Sept. 2005), *available at* https://www.gao.gov/assets/gao-05-734sp.pdf.

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                         4

**App.45**

**ECJ Grant Program Implementation – New Awards**

13.    If EPA were to administer the ECJ program by making new awards, several steps would typically be followed to prudently implement a new grant program. First, because OEJECR was eliminated in the 2025 reorganization, the Agency would need to prepare a new delegation to allow the authority currently vested in the Administrator by Clean Air Act section 138 to be exercised by the new NPM responsible for implementing the ECJ Program. *See* 42 U.S.C. § 7438(b) ("the Administrator shall…award grants…."). Delegations are required by law for actions taken by subordinates to be legally valid. *See e.g.*, *American Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8 (D.D.C. 2011). Based on historical information regarding delegations of authority, we expect preparing the delegation and obtaining the Administrator's signature would take one week.

14.    Second, consistent with EPA Order 5700.7A1, EPA's Policy for Environmental Results under EPA Assistance Agreements,[4] and as required by 2 C.F.R. § 200.202, an NPM would typically link the grant program being designed to the Agency's Strategic Plan.[5] EPA's prior Strategic Plan covered only fiscal years 2022 through 2026. EPA's next Strategic Plan, covering fiscal years 2026 through 2030, is still in development.[6] Therefore, an NPM designing a new grant program within the next two months would be unable to perform this important aspect of policy development.

15.    Third, EPA would need to activate, create, and/or update a Federal Assistance Listing on SAM.gov, a website operated by the General Services Administration (GSA). *See* 31 U.S.C. § 6101 *et*

---

[4] *Available at* https://www.epa.gov/grants/epa-order-57007a1-epas-policy-environmental-results-under-epa-assistance-agreements

[5] A Strategic Plan is "a Federal agency plan containing the organization's comprehensive mission statement, general goals and objectives, description of how the goals and objectives are to be achieved, description of how performance goals are related to the general goals and objectives, identification of key external factors, and description of program evaluations used to establish the general goals and objectives. Strategic plans must cover a period of not less than 5 years and must be updated and revised at least every 3 years." Government Accountability Office, *Glossary of Terms Used in the Federal Budget Process* at 77 (Sept. 2005), *available at* https://www.gao.gov/assets/gao-05-734sp.pdf.

[6] *See* Environmental Protection Agency, EPA Strategic Plan, *available at* https://www.epa.gov/planandbudget/strategicplan (last visited July 29, 2026).

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                    5

**App.46**

*seq.*; 2 C.F.R. § 200.203. An Assistance Listing is a detailed public description of a federal program that provides grants or other types of financial assistance awards. Agencies are required by 2 C.F.R. § 200.202 to create an Assistance Listing before announcing a funding opportunity. Based on historical information regarding updating Assistance Listings through GSA, we expect this process would take approximately two weeks.

16.    Fourth, EPA would typically compete a new grant opportunity in accordance with EPA Order 5700.5A1, EPA's Policy for Competition of Assistance Agreements.[7] EPA Order 5700.5A1 implements the Federal Grant and Cooperative Agreement Act, which expresses the United States Government's policy to "encourage competition in making grants and cooperative agreements." 31 U.S.C. § 6301 *et seq*. Based on historical information, a typical grant competition of this scale would require at least nine months. Under the circumstances, EPA could seek a waiver of this policy from the EPA Grants Competition Advocate, which, if granted, would allow the Agency to implement a non-competitive program consistent with Agency policy. Based on historical information, we expect the process of preparing and obtaining a waiver will take approximately one week.

17.    Fifth, regardless of whether the grant program is competitive, EPA would need to prepare and publish a Notice of Funding Opportunity (NOFO), sometimes known as a Funding Opportunity Announcement (FOA). A NOFO is a publicly available document by which a federal agency makes known its intentions to award discretionary grants or cooperative agreements. EPA's NOFOs are typically published on Grants.gov. A typical NOFO would include, explicitly or via incorporation by reference, all information a potential applicant would need to apply for financial assistance. For example, a NOFO issued on August 6, 2024, as part of the original ECJ Program was 95 pages of dense information.[8] To

---

[7] *Available at* https://www.epa.gov/grants/epa-order-57005a1-epas-policy-competition-assistance-agreements.

[8] *Available at* https://www.epa.gov/system/files/documents/2024-08/environmental-and-climate-justice-community-change-grants-program-nofo-august-2024.pdf.

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                    6

**App.47**

allow time for applications to be submitted, EPA typically leaves a NOFO open for a minimum of 45 calendar days, and often longer.

18.    Sixth, upon a NOFO closing to any further applications, an NPM would typically begin threshold reviews to determine eligibility of the submitted applications. An NPM would typically provide applicants whose applications are eliminated during threshold review written notification of ineligibility, as well as the opportunity for a debriefing. The estimated duration of threshold review depends on multiple factors, including how many applications EPA receives and the complexity of the applications.

19.    Seventh, an NPM would typically begin merit reviews of the eligible applications that passed threshold review. The duration of the merits review stage depends on, among other factors, how many applications EPA receives and the complexity of the applications. Based on historical information, for a program exceeding $1 billion, we estimate the merits review stage would take at least several months.

20.    Eighth, an NPM would typically notify successful applicants that they were selected for award and begin the "award phase," which is the process of finalizing a formal grant award. The award phase typically involves the NPM creating a Funding Recommendation, which then, consistent with the delegation of authority described in paragraph 13 above, must be signed by a program Approval Official.

21.    Ninth, following signature by the program Approval Official, an NPM typically routes the Funding Recommendation package to an EPA Grants Management Official (GMO). Under the GMO's supervision, an EPA Grants Specialist would normally conduct a Comprehensive Administrative Review of the application and Funding Recommendation package to ensure the recommended award meets all statutory, regulatory, and policy requirements. *See* Exhibit A. This review period typically takes up to 45 days. As of July 7, 2026, EPA has approximately 123 Grant Specialists on staff across Headquarters and all ten EPA Regions that could perform this work.

22.    Tenth, if the Funding Recommendation package passes the review described in the previous paragraph, it is typically routed to an EPA Award Official. The EPA Award Official then

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                7

**App.48**

typically reviews the package, and, if satisfied that all statutory, regulatory, and policy requirements are met, approves the award. EPA currently has approximately 12 Award Officials across EPA Headquarters and the ten EPA Regions that could perform this work. Increasing the number of Award Officials would typically require personnel to take additional training, as well as changes to EPA's grants information technology system that would take approximately one week. When an EPA Award Official signs the award, EPA has created a financial obligation to the recipient.

23.    Taking the information in paragraphs 5-22 above into account, I believe it would be extremely unlikely that EPA would be able to prudently implement the ECJ Program by issuing new awards by September 30, 2026.

**ECJ Grant Program Implementation – Reinstatement**

24.    If EPA were to administer the ECJ program by reinstating previously-terminated ECJ grants, EPA would still have several steps to take that could make compliance by September 30, 2026, extremely difficult.

25.    First, EPA would need to determine the universe of ECJ grants to be reinstated, if a given recipient desires reinstatement. Based on data in EPA's financial systems, the number of grants awarded with at least some ECJ Program funding was approximately 306.[9] As of July 28, 2026, approximately 73 of those 306 grants are still financially "open" in EPA's financial system, meaning closeout has not concluded and deobligation of amounts in excess of the recipients' allowable pre-termination, termination, and closeout costs has not been completed. *See* Treml Decl., Dkt No. 205-2. On the other hand, approximately 233 of those 306 grants are reflected as "closed" in EPA's financial system, meaning closeout has concluded and deobligations of amounts in excess of the recipients' allowable pre-termination, termination, and closeout costs has been completed. *See* Treml Decl., Dkt No. 205-2. Based

---

[9] Some grants were funded with multiple lines of accounting, including funds from other, non-ECJ programs. Accordingly, it is difficult to strictly identify some grants as being clearly "an ECJ grant" or "not an ECJ grant."

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                     8

on historical information, we estimate that reinstating the approximately 73 open grants would require approximately three weeks. Because funding would need to be restored to the approximately 233 closed grants, assuming EPA has obtained an apportionment from OMB as described in paragraph 5 above, we estimate reinstatement of those closed grants would require at least two months.

26.     Second, as described in paragraphs 11 and 12 above, EPA would need to assign or obtain staff and/or contractor support. It would be imprudent and impractical to reinstate between 73 and 306 grants without any dedicated EPA staff and/or contractors in place to provide recipients with necessary communication regarding oversight and logistics.

27.     Third, as part of reinstatement, EPA needs to consider that, of the 306 grants identified in paragraph 25 above, approximately 37 are involved in litigation other than *Sustainability Institute*. For comparison, the total dollar amount awarded to the grants at issue in *Sustainability Institute* was approximately $63.7 million, whereas the total dollar amount awarded to grants with at least some ECJ Program funding involved in litigation other than *Sustainability Institute* is approximately $508 million. This puts EPA at significant risk of being unable to comply with potentially conflicting future court orders regarding the same funding.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

TRAVIS
VOYLES

Digitally signed by TRAVIS
VOYLES
Date: 2026.07.31 14:00:55
-04'00'

Travis Voyles
Associate Deputy Administrator
United States Environmental Protection Agency

DECL. OF TRAVIS VOYLES
2:25-cv-02152-RMG                                    9

**App.50**

Exhibit A to Declaration of Travis Voyles



**U.S. ENVIRONMENTAL PROTECTION AGENCY**

**COMPREHENSIVE ADMINISTRATIVE REVIEW**
Use for Processing Grants/Cooperative Agreements
New/ Supplemental Awards
as of May 2025

| I. GENERAL INFORMATION | |
|---|---|
| **Applicant Name:** | |
| **EPA Grant Number:** | |
| **Type of Applicant:** | ☐ State  ☐ Local  ☐ Non-Profit  ☐ University  ☐ Tribe  ☐ Foreign Government  ☐ Other |
| **Type of Action:** | ☐ New  ☐ Supplemental |
| **Applicable Regulations:** | 2 CFR 200 and 2 CFR 1500 and 40 CFR 33<br>Other 40 CFR Parts as necessary:<br>☐ 35 Subpart: _____  ☐ 40 Research<br>☐ 45 Training  ☐ 47 Env. Ed<br>☐ 49 Tribal Air Quality |
| **Additional Requirements:**<br><br>NOTE: Consult National Program Manager (NPM) Guidance documents and FR Templates for additional information | Does the grant program have additional restrictions/requirements that have to be satisfied prior to award? ☐ YES  ☐ NO<br>Programs with Additional Restrictions/Requirements include (but are not limited to) the following:<br><br>☐ Air Pollution Control Program  ☐ National Environmental Education<br>☐ Brownfields  ☐ Water Pollution Control (106)<br>☐ Chesapeake Bay  ☐ Water Quality Mgmt. Planning (604b)<br>☐ Clean Water/Drinking Water SRF Indian  ☐ State Indoor Radon<br>☐ Environmental General Assistance  ☐ Training Assistance<br>☐ Non-Point Source Management Grants  ☐ Superfund, Subpart M & O<br>☐ Water Infrastructure Congressional Earmarks (cannot be awarded without NEPA clearance) |
| **Statutory Authority (or Statutory Authorities, as appropriate):** | |
| **Assistance Listing Number:** | |
| For more information about Statutory Authorities, Assistance Listings, and Delegations of Authority, refer to: Grants Crosswalk | |

**App.52**

| II. ELIGIBILITY AND PRE-AWARD CAPABILITY REVIEW | YES | NO | REFERENCES & NOTES |
|---|---|---|---|
| **1.** Is the Applicant eligible to receive assistance based on the statutory authority, assistance listing number (CFDA), competitive solicitation and/or regulations? | ☐ | ☐ | **If NO, the award cannot be made. Please alert your Grants Management Officer (GMO) to notify the applicant.**<br><br>*NOTE- Sam.gov and/or the competitive solicitation are the recommended sources for this determination.* |
| **2A.** For this application, does the HQ/Regional office have Approval Authority?<br><br>• Are there any limitations contained in the Approval Delegation?<br> ○ If YES, were they met?<br>   ☐ Yes<br>   ☐ No<br><br>**2B.** For this application, does the HQ/Regional office have Award Authority?<br><br>**REMINDER:** *Approval and Award Authorities can never be the same. Standard Award Authority is found at:* 1-14-A. | ☐<br><br>☐<br><br><br><br><br><br>☐ | ☐<br><br>☐<br><br><br><br><br><br>☐ | **If NO to any question, the award cannot be made**<br><br>**APPROVAL** Delegation Number: _____<br><br>Approval Official:<br>☐ AA/RA<br>☐ Division Director (name)_____<br>☐ Other: _____<br><br>**AWARD** Delegation Number if other than 1-14-A: _____<br>Award Official: _____<br><br>*NOTE- Limitations contained in the Delegation of Authority must be satisfied prior to assistance.* |
| **3A.** Does the applicant have a valid registration in the System for Award Management (SAM)? Website: SAM.gov<br><br>Expiration Date: _____<br><br>*NOTE- The applicant **MUST** have a valid registration at the time of award or the award will be rejected by other federal systems. If this applicant's registration expires within 30 days of your review, contact the applicant to remind them to renew their registration so that it is current when the award is signed.*<br><br>**3B.** Does the Organization *Name* or *Doing Business As* in SAM agree with the Legal Name on the SF-424 and in the NGGS Public Address Book (PAB)?<br><br>**3C.** Does the *Entity Mailing Address* in SAM agree with the Address on the SF-424 and in the PAB?<br><br>**3D.** Does the Unique Entity Identifier (UEI) on the SF-424 agree with the information in PAB for this applicant?<br><br>**3E.** Does the applicant or any entity or person identified in the application have any exclusions listed in the System for Award Management?<br>Website: SAM.gov<br>Quick Start Guide for Exclusions Search & View<br><br>Date Checked: _____ | ☐<br><br><br><br><br><br><br><br><br><br><br>☐<br><br><br><br>☐<br><br><br>☐<br><br><br>☐ | ☐<br><br><br><br><br><br><br><br><br><br><br>☐<br><br><br><br>☐<br><br><br>☐<br><br><br>☐ | Applicant must be registered before award can be made for new awards and supplemental amendments. The registration date must be current.<br><br>**If NO, applicant must be advised to register/re-register at SAM.gov and that no award can be issued until proof of registration is provided.**<br><br>See also: PN-2016-G03 "Verification of Applicant Organization and DUNS Number"<br><br>*NOTE- In order to access the most current data, you **MUST** log into SAM.gov using your Government credentials when checking applicant information. For information on using SAM, See:*<br>SOP-2022-G01<br><br>**3B., 3C. & 3.D Related Reference Notes:** *Acronyms of Grantee information in the PAB entry should not be changed. If the applicant information does not match in SAM and the PAB, Grant Specialists should work with their Grant Automation Coordinators (GAC) to upd#ate the PAB entry with any necessary changes. The UEI, Entity Name, and Address in the award document must match SAM.gov or else the award cannot be made.*<br><br>**3E. Related Reference Note: Award may not be made to entities or persons excluded from participation in Federal Assistance programs. If applicant is listed, notify GMO and Program Office.**<br>See Grants Policy Issuance (GPI) 18-01 – Suspension and Debarment |

**App.53**

| | | |
|---|---|---|
| **4.** Is the expected total amount of the award >$250K? If Yes, a review of Federal Awardee Performance Integrity Information System (FAPIIS) is required within 30 days prior to award. FAPIIS information is available through the Entity Information in SAM.gov.<br><br>The FAPIIS data in SAM.gov is named responsibility/ qualification, or R/Q for short, and is part of the entity information domain in SAM.gov.<br><br>*(screenshot of SAM.gov entity for SAINT REGIS MOHAWK TRIBE, Unique Entity ID G9GLDN3W57D1, Active Registration, Expiration Date Apr 6, 2023, CAGE/NCAGE 4RKV0, Purpose of Registration Federal Assistance Awards Only, Physical Address 71 Margaret Terrance Memorial WAY Akwesasne, New York 13655-3236, United States, Mailing Address 71 Margaret Terrance Memorial WAY Akwesasne, New York 13655-3109, United States. Left menu: Entity Registration, Core Data, Business Information, Entity Types, Financial Information, Points of Contact, Assertions, Reps and Certs, Exclusions, Responsibility / Qualification — circled in red with handwritten note "FAPIIS INFO")*<br><br>Agencies will continue to submit responsibility and qualification data through the FAPIIS Module in the Contract Performance Assessment Reporting System (CPARS). See FAPIIS Instructions in the CPARS Guide<br><br>Date Checked: _____ | ☐ ☐ | If YES, include a screenshot in the grant file from the Responsibility/Qualification screen in SAM.gov, showing the search results and date of search. If there are any negative findings, please address with the GMO and Award Official immediately. If an award is not made, the AO/GMO must work with the National Policy Training and Compliance Division (NPTCD). See Policy Notice 2016-G02-R2<br><br>*NOTE- In order to access the most current data, you* **MUST** *log into SAM.gov using your Government credentials when checking applicant information.* |

| **NON-PROFIT APPLICANTS** ☐ N/A<br>(If N/A, skip to Section III, [No. 7] in this document) | **YES** | **NO** | **N/A** | **REFERENCES & NOTES** |
|---|---|---|---|---|
| **5.** Is the Applicant an eligible Non-Profit organization?<br><br>**5A.** How was the applicant's 501(c) status verified? Check appropriate box below:<br><br>   IRS Letter, Articles of Incorporation or State<br>   incorporation (Include in the grant file)<br>   ☐ IRS Website: IRS Non-Profits (Include screenshot of website in grant file)<br><br>**5B.** If the Non-Profit organization is a 501(c)(4), has it confirmed via email or otherwise that it does not lobby? | ☐<br><br>☐<br><br><br><br><br><br>☐ | ☐<br><br>☐<br><br><br><br><br><br>☐ | ☐<br><br>☐<br><br><br><br><br><br>☐ | If NO, contact your GMO and Program Office to discuss.<br>Reference: IRS Tax Exempt Status For Your Organization<br><br>**5A. Related Reference Notes:**<br>Note: If the applicant's tax status indicates a status other than 501(c)(3), 501(c)(4), 501(c)(6), consult with your HQ or Regional Counsel.<br><br>**5B. Related Reference Notes:**<br>If NO, this application may not be funded because award of assistance is prohibited to organizations which lobby or use Federal funds to lobby. |
| **6.** Has this applicant applied for more than **$200K** federal funds for this action?<br><br>*Note: Pre-award certifications are* **NOT** *required for awards of $200K or less.*<br><br>**6A.** Does the applicant have an active Pre-Award Certification?<br><br>Expiration Date of Certification: _____<br><br>If the certification expires during the life of the award there is NO need to request a pre-award recertification. | ☐<br><br><br><br><br>☐ | ☐<br><br><br><br><br>☐ | | If YES, applicant must be certified prior to award. Check COMPLY to determine if certification requirements have been met. If No, go to 7B.<br><br>**See EPA Order 5700.8**<br><br>**6A. Related Reference Notes: If NO, the Pre-award Certification process should be completed prior to award.** In rare instances, a conditional award can be made with proper approvals and written notice to the NPTCD Director, see EPA Order 5700.8 section 10(d). If a current certification is set to expire within approximately 30 days of the anticipated signature date, it is recommended to refer the grantee for re-certification. |

**App.54**

| | | | |
|---|---|---|---|
| The recipient would only need to be re-certified if it is slated to receive a NEW award. | | | Request Non-Profit Pre-Award Review Capability Certification at: Non-Profit Pre-Award Certification Review Request |
| **III. RISK REVIEW** | **YES** | **NO** | **REFERENCES & NOTES** |
| **7A.** Is this a new recipient (defined as not having received an award from EPA on or after October 1, 2014 (FY 2015)? If No, skip to Question 8.<br><br>**7B.** If Yes, has recipient completed the mandatory training requirement outlined in PN-2024-G02? If yes, skip to question 8. | ☐<br><br>☐ | ☐<br><br>☐ | Use this walkthrough for instructions on how to look up a recipient's award history in USASpending.gov.<br><br>Use these instructions to check for completion of the training requirement in Applicant and Recipient Training Report - Power BI (powerbigov.us)<br><br>**IF NO:**<br>• Add the New Recipient Training Requirement term and condition to the award<br>• Use "ADDITIONAL FOLLOW-UP ACTIONS" section of this checklist to note the Special Condition and follow-up needed with the recipient to ensure completion of the training |
| **8.** Are there any unresolved reports in COMPLY and/or overdue closeouts identified in the "EPA GRIP Tool" for this applicant?<br><br>**If yes, which cost categories does it affect?**<br><br>☐ All<br>or select specific ones:<br><br>☐ Personnel    ☐ Fringe benefits<br>☐ Travel    ☐ Supplies<br>☐ Equipment    ☐ Contractual<br>☐ Indirects    ☐ Other (e.g., Subawards or Participant Support Costs)<br><br>Reminder: verify that the applicant's corrective action plan is being implemented properly and/or include a special T&C in the award. | ☐ | ☐ | If YES, this application may not move forward until: 1) all unresolved administrative findings are remedied, 2) a special term and condition has been added to the award, and/or 3) the applicant has a corrective action in place that addresses the concern. In the event that this matter cannot be resolved and the award is denied, the GMO must notify the NPTCD Director.<br><br>See Section 10 of EPA Order 5700.8 for further guidance and GS should consult with your Grants Management Officer, as appropriate.<br><br>If you answered YES, you must add a comment in the "ADDITIONAL FOLLOW-UP ACTIONS" section of this checklist explaining what the findings are and what steps you took to resolve. |
| **9.** Are there performance, technical, management and/or administrative issues that affect the risks posed by the applicant if it gets an award?  For example:<br><br>• Are there issues that the program office has informed the grants office about, or that the grants office is otherwise aware of, that impact the applicant's financial stability and/or management systems that could adversely impact successful performance of the grant?<br>• Are there past performance or audit issues that could affect the ability of the applicant to successfully perform the grant and ability to effectively implement grant requirements?<br>• Are there other performance, technical, management or administrative issues that may impact the applicant's ability to successfully perform the grant-if so, explain them. | ☐ | ☐ | If you answered YES, you must add a comment in the "ADDITIONAL FOLLOW-UP ACTIONS" section of this checklist explaining what the findings are, whether it increases risks to the Agency if the applicant receives an award, and what steps you took to resolve the issues or address the risks. |

**App.55**

| IV. ADMINISTRATIVE REVIEW | YES | NO | | REFERENCES & NOTES |
|---|---|---|---|---|
| **10.** Was the application for Federal Assistance (SF-424) signed by the Authorized Certifying Official or was the application submitted by an Authorized Organizational Representative through GRANTS.gov?<br><br>**10A.** Have all of the required forms and documents been signed and submitted with the application?<br><br>☐ Key Contact Form (EPA Form 5700-54)<br><br>☐ Certification Regarding Lobbying - EPA Form 6600-06<br><br>( > $100K), as applicable  ☐ N/A<br><br>☐ Budget Information for Non-Construction Programs – SF-424A<br><br>☐ Budget Detail Narrative<br><br>☐ Workplan/Scope of Work<br><br>☐ Pre-Award Compliance (EPA Form 4700-4) ☐ N/A<br>(for supplemental actions)<br><br>☐ Indirect Cost Rate* as applicable  ☐ N/A<br><br>*Negotiated Rate, Approved Cost Allocation Plan, or indication by the applicant that the default 10% de minimis rate will be used. | ☐ | ☐ | | **9. Related Reference Notes:**<br>**If not signed by an authorized representative, the GS must contact the applicant and obtain the appropriate signatures via the revised application with accurate signatures or a verification via email that the signatory is authorized by the organization.**<br><br>Note: Digital signatures on forms received through Grants.gov are acceptable even if the signer is not listed among the Key Contacts. Grants.gov ensures that all persons who digitally sign application forms are authorized to submit them on behalf of the applicant organization.<br><br>Refer to [PN-2018-G12 and guidance] & [GPI 09-01] & PN-2020-G04-R2<br><br>**9A. Related Reference Notes:** Ensure that you obtain any missing documents or revisions to existing documents via email (not through Grants.gov) and distribute to appropriate EPA staff.<br><br>For additional information, see the GPIs listed above, as well as<br>• GPI-14-01 Electronic Submission of Initial Grant Applications and<br>• PN-2015-G06 Mandatory Use of Pre-award System for All Applications and<br>• PN-2016-G03 "Verification of Applicant Organization and DUNS Number" |
| **11.** Have you reviewed sections I.A., I.B. and I.C. of EPA Form 4700-4 (Pre-award Compliance Review Report) in accordance with the following SOP: https://work.epa.gov/sites/default/files/2024-06/sop_2023_g01.pdf and forwarded it to the OECRC designated reviewer using the EPA Grant File system?<br><br>Has the applicant submitted the most current version of the Form?<br><br>Has the 4700-4 Form has been signed and dated by an applicant's Authorized Representative? Note: Digital signatures on forms received through Grants.gov are acceptable even if the signer is not listed among the Key Contacts. Grants.gov ensures that all persons who digitally sign application forms are authorized to submit them on behalf of the applicant organization.<br><br>Date forwarded to OECRC designated reviewer: _____<br><br>**11A. Has the designated reviewer approved the 4700-4 and has the approval been recorded in the EPA Grant File system?** | ☐<br><br>☐<br><br>☐<br><br>☐ | ☐<br><br>☐<br><br>☐<br><br>☐ | ☐<br><br>☐<br><br>☐<br><br>☐ | For new awards only, the GS must verify the information in sections I.A. through I.C. of the 4700-4 Form (Address Information and Unique Entity Identifier). The GS must also ensure that it has been signed by an applicant's Authorized Representative prior to submitting the Form to the reviewer through the EPA Grant File System.<br>If:<br>• section I.A. and/or I.B. does not match the SF-424 information, or<br>• section I.C. is not properly completed<br>• the form has not been signed and dated by an authorized representative, or<br>• the version of the 4700-4 is outdated,<br>the GS must request a new Form from the applicant.<br><br>This application may not be funded until the form has been approved by the OECRC designated reviewer. In rare cases, a conditional award may be necessary prior to a decision to prevent the loss of expiring funds. See Appendix I of the SOP for the T&C for Conditional Awards |

**App.56**

| | | | If the form is not approved, the award cannot be made. |
|---|---|---|---|
| Date of OECRC designated reviewer approval: _____ | | | Refer to the Job Aid for Obtaining, Transmitting and Documenting EPA Form 4700-4 Reviews For Grant Specialists and OECRC Designated Reviewers for details on how to obtain, transmit and document the 4700-4 form.<br><br>It is OECRC's responsibility to inform the GS, the GMO, the Program Office and RTP Finance Office of all decisions relating to non-compliance findings and actions taken. Communications regarding OECRC's review and determination must be retained in both the OECRC and EPA Grant File System. |
| **12.** Has the applicant indicated it is delinquent on any Federal debt?<br><br>If Yes, is the applicant a Non-Profit or For-Profit?<br><br>Debt is a potentially complex issue. Grant Specialists must be sure to consult with OGC/ORC and their GMOs to be sure there are no prohibitions to making a grant award.<br><br>There are differences by type of recipient and debt. To provide assistance OGD has developed a Guidance document entitled: "Unpaid/Delinquent Federal Debt" which details the recommended procedures for staff to follow. | ☐<br><br>☐ | ☐<br><br>☐ | If the applicant has checked Yes on the SF-424 form, then the GS must contact the applicant to determine if the matter has been resolved and request supporting documentation. If the matter has not been resolved or if the applicant is unable to provide adequate documentation regarding this matter, the GS must bring this to the attention of the GMO for next steps and/or resolution, which may include debt offsets included in an award made to other than non-profits and for-profits.<br><br>NOTE- Federal assistance cannot be granted to non-profit and for-profit applicants that are delinquent on Federal debt. |
| **13.** According to section "**Preapplication Coordination**" of the Assistance Listing and EPA's list of programs subject to Intergovernmental Review https://www.epa.gov/grants/epa-financial-assistance-programs-subject-executive-order-12372-and-section-204-demonstration is the application subject to the Intergovernmental Review (E.O. 12372) & Section 204 Demonstration Cities & Metropolitan Development Act (DCMDA) requirements contained in 40 CFR 29?<br>Select the language from the list of programs subject to Intergovernmental Review:<br><br>☐ Excluded ("This program is excluded from coverage under E.O. 12372")<br><br>☐ Eligible ("This program is eligible for coverage under Executive Order (EO) 12372, Intergovernmental Review of Federal Programs")<br><br>If eligible, what was the date submitted for review either to a participating Single Point of Contact (SPOC) or directly to affected areas by the applicant: _____<br>See Q.19 of the SF-424<br><br>**\* 19. Is Application Subject to Review By State Under Executive Order 12372 Process?**<br>☐ a. This application was made available to the State under the Executive Order 12372 Process for review on _____.<br>☐ b. Program is subject to E.O. 12372 but has not been selected by the State for review.<br>☐ c. Program is not covered by E.O. 12372. | ☐ | ☐ | If NO (Excluded), then no action is required by the applicant. If YES, ensure the sub questions on the left-side of this Checklist are completed adequately.<br><br>**REVIEW PERIOD TIMEFRAMES:**<br>• Continuing Grants- Waiting period is 30 days<br>• Project Grants- Waiting period is 60 days<br>• DCMDA- Waiting period is 60 days<br><br>*NOTE 1: Intergovernmental review does not apply to tribal governments*<br><br>*NOTE 2:* The EO 12372 process should be completed prior to award. In rare instances, a conditional award (a special award term and condition must be applied) can be made with proper approvals. An example of the Administrative term and condition is as follows:<br><br>*"INTERGOVERNMENTAL REVIEW PERIOD*<br>*In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period on this grant program. Accordingly, the recipient may incur costs at its own risk but shall not draw down any funds associated with this award until the process is completed. This includes successful resolution of any issues identified during the comment period. The recipient must provide evidence of* |

**App.57**

| | | | |
|---|---|---|---|
| Note: In the absence of a SPOC, applicants must directly notify affected localities.<br><br>Has the timeframe for comment expired? ☐ Yes ☐ No<br>Were comments submitted? ☐ Yes ☐ No<br>Were comments addressed? ☐ Yes ☐ No ☐ N/A<br><br>☐ Program is eligible but affected area organizations do not participate. Documentation must be in the file. | | | *submission of the project for intergovernmental review. This submission must be sent by email to the EPA Grants Specialist with a courtesy copy to the Project Officer. The comment period will end {INSERT APPROPRIATE NUMBER BASED ON ABOVE REVIEW PERIOD TIMEFRAMES} days from the aforementioned submission."* |
| **14.** Has the applicant included Pre-Award Costs in its budget/work plan/SF-424?<br><br>**NOTE-** Pre-Award costs are defined as costs incurred prior to the award date, but on or after the start date of the budget/project period. All eligible costs must be incurred during the budget/project period as defined by the start and end date shown on the grant award.<br><br>**If YES, are the Pre-Award Costs allowable?**<br>• **Must be included in the budget/work plan/SF-424or revision thereto**<br>• **Must be allowable by regulations/statute/policy**<br>• **Must be approved by the Project Officer via the FR or revision thereto.**<br>• **If over 90 days, a justification is required in Question E.2.a of the FR or revision thereto.**<br>• **No justification is required for pre-award costs up to 90 days** | ☐ | ☐ | If YES, GS must add pre-award term & condition (provided below) for any costs incurred prior to the award start date:<br><br>*"PRE-AWARD COSTS*<br>*In accordance with 2 CFR 1500.9, the grantee may charge pre-award costs (both Federal and non-Federal matching shares) incurred from {INSERT START DATE} to the actual award date provided that such costs were contained in the approved application and all costs are incurred within the approved budget period."*<br><br>Pre-award costs are not always authorized or may be limited.<br><br>See additional guidance and restrictions at:<br>[2 CFR 200.458](#)<br>[2 CFR 200.308(d)(1)](#)<br>[2 CFR 1500.9](#)<br>40 CFR 35 Subparts [A](#), [B](#), [M](#) and [O section 35.6275](#). |
| | ☐ | ☐ | |
| **15.** Is the proposed timeframe for the project within the statutory/regulatory/policy time constraint requirements?<br><br><br>All project and budget period waivers can be found on OGD's intranet [waiver page](#) | ☐ | ☐ | Check Statutory/Regulatory/Policies/CFDA Limitations Budget and project period timeframes may not exceed limitations imposed by [M Accounts](#) (see page "2-14" of the linked document).<br><br>See [PN-2018-G11](#), and [GPI 11-01](#), & [GPI 12-06](#).<br><br>• **Earmark Duration not limited**<br>• **7 years Discretionary Grants, Part 35 Subpart O, SRFs**<br>• **5 years STAG-CEP & LUST**<br>• **4 years Indian General Assistance Program**<br>• **3 years Training** |

| **V. FINANCIAL REVIEW** | YES | NO | N/A | **REFERENCES & NOTES** |
|---|---|---|---|---|
| **16.** For State and Tribal grants under Part 35 Subparts A & B, has the State/Tribe requested a simplified cost review? If Yes, has the State/Tribe provided annual budgets and self-certified its internal controls system? ==See Column "N" of the [Grants Crosswalk](#) which identifies eligible grant programs.==<br><br>[NOTE: Check the "Recipient Summary" of the [COMPLY](#) system to confirm previous submittal of State Cost Review Assurance] | ☐ | ☐ | ☐ | If the answer to all questions is Yes, then the cost review template for 40 CFR Part 35 Subpart A or B can be used.<br><br>If any of the answers are NO, or the recipient is high risk, then the Project Grant Cost Review template must be used.<br><br>See [Interim Guidance on Cost Review of Grants/Performance Partnership Grants Awarded under 40 CFR Part 35 Subpart A](#) |

**App.58**

| | | | | |
|---|---|---|---|---|
| **Recipient Information**<br><br>Basics<br><br>Name: ENVIRONMENTAL CONSERVATION, NEW YORK DEPARTMENT OF<br>Abbreviation: NYSDEC<br><br>DUNS: 806780912<br><br>Region: EPA R2<br><br>Recipient Type(s) [SAM.Gov]: U.S. State Government<br><br>Website:<br><br>State Cost Review Assurances on File:  Yes | | | | See also GPI 08-04 State Grant Cost Review and GPI 13-02 Streamlining Tribal Grants Management.  For Certification template, see Attachment 1 (page 6) of GPI 08-04. |
| **17.** Have you completed the appropriate cost review form?<br>• Cost Review Template For GRANT SPECIALISTS - Continuing Environmental Program/Gap Or Project Grants (DOCM)<br><br>• Cost Review Template For Grant Specialists - Project Grants And All Other Grants Subject To This Cost Review - Required Use Oct 1, 2008<br>• Cost Review Template and Guidance for Grant Specialists Special Appropriations Act Projects* and CWSRF & DWSRF Grants for DC and Territories<br>• Cost Review Template and Guidance for Grant Specialists Clean Water & Drinking Water State Revolving Fund (CWSRF and DWSRF) Grants<br>• Cost Review Template And Guidance For Grant Specialists - Grants Under 40 CFR Part 35 Subpart A (to be used in accordance with GPI 08-04)<br>• Cost Review Template for Grants Specialists – Grants under 40 CFR Part 35 Subpart B (to be used in accordance with GPI 13-02) | ☐ | ☐ | ☐ | See also Internal Interim Final General Cost Review Guidance for Assistance Agreements (PDF) (for POs and GSs)<br><br>Cost review templates and guidance, as well as indirect cost and cost share calculators are available here: https://work.epa.gov/grants/cost-review<br><br>REMINDER: use of the combined CEP/Project Grant template is strongly encouraged but optional for all grants except for Congressionally Directed Spending awards under program code CG.  For this program, the use of **Project Grant Option** of this form is **Mandatory**. |
| **18.** Are there Statutory/Regulatory/Programmatic Cost Share requirements for this award?<br>If NO, Proceed to Question No.18.<br>If YES, complete Questions below:<br><br>Cost-share/match is based on:<br><br>☐  Statute<br><br>☐  Regulation<br><br>☐  Other (e.g., required under a competition or voluntary)<br><br>**What is the Cost-share requirement (specify the percentage(s), and the types of costs to which it applies and explain any exclusions):**<br><br> | ☐ | ☐ | ☐ | If the match provided by the applicant is insufficient, the application must be revised to provide for adequate cost-sharing or the award cannot be made (or a lower federal amount corresponding to the lower cost-share may be possible to award).<br><br>NOTE: If the project includes EPA In-Kind costs, then ensure that the Cost-share/Match is based on the total EPA Contribution, including EPA In-Kind.<br><br>See Grants Crosswalk for cost share requirements for each program and OGD Cost Share Training<br><br>Cost-share may be based on total project costs, amount of Federal funds provided, or something else; for example, only certain types of costs may be subject to the match such as equipment in some DERA grants or set asides in DWSRF. However, the calculation shown in the award document is always the result of dividing line 12 by line 11 on the budget "approved budget" table in the draft award document. percentages should be shown with two (2) decimal places [e.g., 50.67%]<br><br>**17A. Related Reference Notes:**<br>• **Air 105 MOE:** No agency shall receive any grant under this section during any fiscal year when its expenditures of non-Federal funds for recurrent expenditures for air pollution control programs will be less than its expenditures were for such programs during the |

| | | | | |
|---|---|---|---|---|
| **18A.** Does the application have a maintenance of effort/level of effort requirement (See guidance in Reference/Notes if applicable for Air 105, Water 106 & Nonpoint Source 319)?<br><br>**18B.** What is the source of the Cost-share/Match?<br>☐ **Other Federal Funds \*(see reference note)**<br>☐ **Recipient Contribution**<br>☐ **State Contribution (for agreements where the State is not the Recipient)**<br>☐ **Local Government/Authority Contribution (for agreements where the Local Government/ Authority is not the Recipient)**<br>☐ **Other Contribution** | ☐ | ☐ | ☐ | preceding fiscal year. In order for the Administrator to award grants under this section in a timely manner each fiscal year, the Administrator shall compare an agency's prospective expenditure level to that of its second preceding fiscal year.<br><br>• **Water 106 LOE:** To receive a Section 106 Water Pollution Control grant, a State or interstate agency must expend annually for recurrent Section 106 program expenditures an amount of non-federal funds at least equal to expenditures during the fiscal year ending June 30, 1971. |
| If any of the Cost-share/Match is being met through Recipient or third-party In-Kind contribution, has the recipient provided adequate information within the budget detail and narrative documentation demonstrating the value of the proposed In-Kind costs?<br><br>**18C.** Is the applicant proposing leveraging? | ☐ | ☐ | ☐ | • **Nonpoint Source 319 LOE:** No grant may be made to a State under this subsection in any fiscal year unless such State enters into such agreements with the Administrator as the Administrator may require to ensure that such State will maintain its aggregate expenditures from all other sources for programs for controlling pollution added to the navigable waters in such State from nonpoint sources and improving the quality of such waters at or above the average level of such expenditures in its two fiscal years preceding February 4, 1987<br><br>**17B. Related Reference Notes:**<br>\*Using Federal funds for Cost-share is generally prohibited except for Community Development Block Grants & General Revenue Sharing funds or unless the other Federal agency has specific authorizing legislation which permits their funds to be used as cost-share/matching costs. |
| | ☐ | ☐ | ☐ | If NO, follow up with the recipient to obtain additional budget details. Refer to 2 CFR 200.306(d) - (j) for guidance on what to expect when reviewing In Kind budget information.<br><br>**17C. Related Reference Notes:**<br> If YES, the "leveraging" term and condition must be included in all competitive awards where the recipient proposed and was evaluated based on leveraging. If the leveraging included a voluntary cost-share or overmatch component, then the "voluntary cost-share or overmatch" term and condition must also be included in the competitive award.<br><br>For additional information and guidance see Cost-Share Leveraging Guidance |

| **VI. GRANTS SPECIALIST WORKPLAN REVIEW** | YES | NO | **REFERENCES & NOTES** |
|---|---|---|---|
| **19.** Do all the activities contained in the workplan appear consistent and allowable with authorizing statute(s)?<br><br>Do the activities align with the proposed budget? | ☐<br><br>☐ | ☐<br><br>☐ | Grants Specialists should conduct a cursory review of the work plan to check for any potentially unallowable activities or procurements. If any are identified the GS should consult with the PO, GMO, and OGC/ORC as appropriate to make a final determination. Then the PO should follow-up with the applicant to obtain a revised application package that removes unallowable items and associated budget entries.<br><br>The GS should look for any obvious inconsistencies and follow-up with the PO and/or GMO to determine appropriate resolution with the applicant. |

**App.60**

| 20. Does the workplan include any of the following items? ☐ Program Income ☐ Sole source procurements ☐ International activities/travel ☐ Conferences/workshops ☐ Food/Refreshments Participant support costs ☐ Subawards ☐ Participant support costs ☐ Data collection/measurement requiring QA ☐ Equipment ☐ Planned surveys requiring OMB approval ☐ EPA In-Kind Support | ☐ | ☐ | Each of these items has special requirements and restrictions that must be specifically addressed by the Project Officer in the funding recommendation and/or cost review. The GS needs to be aware of these in advance of conducting a review of the FR to ensure that the PO didn't overlook any. See also: Internal Interim Final General Cost Review Guidance for Assistance Agreements (PDF) (for POs and GSs) The latest drafts (as of May 2025) of the Cost Review Guidance and Project Officer Cost Review Template for Continuing Environmental Program and Project Grants can be found here: https://work.epa.gov/grants/cost-review |
|---|---|---|---|
| 21. Does the work plan contain milestones, and output and outcome measures as required in the Environmental Results Order? | ☐ | ☐ | These should be easily identifiable. If these are not present in the work plan, the GS should consult with the PO for follow-up with the applicant. The term "outcome" means the result, effect or consequence that will occur from carrying out an environmental program or activity that is related to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related or programmatic in nature, must be quantitative, and may not necessarily be achievable within an assistance agreement funding period. The term "output" means an environmental activity, effort, and/or associated work products related to an environmental goal or objective, that will be produced or provided over a period of time or by a specified date. Outputs may be quantitative or qualitative but must be measurable during an assistance agreement funding period. |

| VII. GRANTS SPECIALIST FUNDING RECOMMENDATION REVIEW | YES | NO | REFERENCES & NOTES |
|---|---|---|---|
| 22. [FR Section I] Has the Funding Recommendation (FR) been signed by the Authorized Approval Official or their Delegate? (note: if a delegate is signing the FR, a best practice is to include a comment in the FR indicating that the delegate was acting in the absence of the approval official) | ☐ | ☐ | **If FR is not signed by the correct Approval Official with the proper Delegated Authority return FR to Draft for correction by the PO.** See Return to Sender Guidance |
| 23. [FR Sections A.15 & A.16] Are the Statutory Authority and Delegation of Authority correct? They should match the information in the Grants Crosswalk | ☐ | ☐ | **If incorrect, the FR must be sent back to Draft for correction by the PO.** **NOTE-** Some Delegations have specific limitations that require national concurrence in the form of a memo that should be attached to the FR before the FR is finalized, such as Delegation 14-45. Some new programs may also have Temporary Delegations, so verification of current status may be required. Note also, if international activities are included in the Agreement, NEPA 102(2)(f) should likely be added as an authorizing statutory authority in section A.15. See Return to Sender Guidance |
| 24. [FR Section A.23.a thru d] Does the project description comply with the Data Quality Standards for project descriptions? See SOP-2021-G04. | ☐ | ☐ | If NO, advise PO to enter an FR comment to fix the description and/or provide additional information for sections A.23.a through c. **Note: if any changes are needed to the Subrecipient Activities description (A.23.d ) they can** |

**App.61**

| | | | |
|---|---|---|---|
| The Description must address the following 4 elements:<br>1. Assistance award's purpose;<br>2. Activities to be performed;<br>3. Anticipated deliverables and expected outcomes, and intended beneficiary(ies);<br>4. Subrecipient activities if known or specified at the time of award.<br><br>It must also include a concise, clear description of the purpose/scope of the project in a manner that is understandable to the public. It should contain media-specific or environmental KEY TERMS that may be used as search terms by the public (e.g., air quality, toxins, solid waste, mercury, etc.). | | | only be made by revising the description in FR Question E.9. This will require the FR to be returned to draft.<br><br>Did you know that the first 140 characters (including spaces) of the project description get posted on the USASpending.gov website? |

| | YES | NO | REFERENCES & NOTES |
|---|---|---|---|
| **25. [FR Section B.1.a. & B.1.b.]** Has the PO properly documented the decision to award a Cooperative Agreement vs. a Grant?<br><br>Key elements:<br>1) The description should establish that assistance is appropriate because the project is authorized by Federal statute for the recipient to implement its own program for a public purpose.<br>2) It should define the level of EPA involvement to determine if a Grant or Cooperative Agreement is appropriate. | ☐ | ☐ | If incorrect, the FR must be sent back to Draft for correction by the PO.<br><br>**NOTE- A Programmatic T&C for Substantial Involvement must be included in the FR for a Cooperative Agreement.**<br><br>See Return to Sender Guidance<br><br>See the Policy for Distinguishing Between Assistance and Acquisition, EPA Order 5700.1. |

| | YES | NO | N/A | REFERENCES & NOTES |
|---|---|---|---|---|
| **26. [FR Section B.2 thru B.2.h.]** If the workplan and budget include activities involving conducting conferences or workshops, has the PO addressed **ALL** the applicable FR questions?<br><br>**Note 1**: Community Meetings funded by assistance agreements must comply with these requirements.<br><br>**NOTE 2:** POs must provide responses for FR questions B.2.a thru g.  No blanks are allowed. | ☐ | ☐ | ☐ | If YES, Program must demonstrate compliance with the Best Practices for Conferences in FR.<br><br>**If NO, return FR to Draft for correction by the PO.**<br><br>See Return to Sender Guidance<br><br>Also see:  200.432 Conferences, which includes the following definition:  A conference is defined as a meeting, retreat, seminar, symposium, workshop or event whose primary purpose is the dissemination of technical information beyond the non-Federal entity and is necessary and reasonable for successful performance under the Federal award. |

**App.62**

|  | YES | NO | N/A | REFERENCES & NOTES |
|---|---|---|---|---|
| **27**. [**FR Section B.3. thru B.3.a.**] If the workplan and budget include activities involving costs for light refreshments, meals, or beverages, has the PO addressed the applicable FR question?<br><br>**NOTE-** Grants Management Officers or Award Officials will make the final decision regarding the allowability and necessity of certain selected items of costs based upon the scope of work or workplan, budget, and if necessary, additional information provided by the recipient.<br><br>**27A**. [**FR Section B.3.a.**] If YES, has the PO attached a completed "Food Policy" checklist. | ☐<br><br><br><br><br><br><br><br><br><br>☐ | ☐<br><br><br><br><br><br><br><br><br><br>☐ | ☐<br><br><br><br><br><br><br><br><br><br>☐ | See: PN-2016-G05 and Guidance on Selected Items of Cost<br><br>If Yes, the PO must include the Checklist for Determining the Allowability of Cost for Light Refreshments and Meals Under Assistance Agreements, i.e., "Food Policy" checklist, to the Funding Recommendation (FR) for new or continuation awards and amendments to awards made on or after 1/1/2011.<br><br>**26A Related Reference Notes:** If NO, advise PO to enter FR comment to provide the checklist. |
| **28**. [**FR Section B.4.**] Has the PO adequately addressed how the project relates to the Statutory Authority?<br><br>The Statutory authority may be simple or complex. Items such as eligibility, match, progress, maintenance of effort and administrative cost restrictions may be included in the statute and therefore, the PO response must address how each is satisfied. In addition, some projects may require multiple statutory authorities and they all must be addressed in the response. | ☐ | ☐ |  | **If NO, return FR to Draft for correction by the PO.** See Return to Sender Guidance<br><br>All statutes cited in FR section A.15 must be addressed in FR section B.4.<br><br>All activities must be allowable under the authorizing Statute(s) and the recipient must be eligible and other stipulations must be addressed. (e.g. 319(h) Nonpoint Source Management Program is an example of a complex Statutory Authority)<br><br>See the **Grants Crosswalk** |
| **29**. [**FR Section B.5. Funding Table**] Do the PRC(s) align with the appropriate Statutory Authority(s)?<br><br>If the choice of PRC appears to be incorrect or appears to be inappropriate for the Statutory Authority, verify using the Program/Project Description Book or the FY 2022 – FY 2026 EPA Strategic Plan, and PN-2022-G04, Procedural Guidance and PRC Crosswalk.<br><br>**29A.** Does the total dollar amount in the PRC Table match the amount of the current action (the amounts listed Commitment Notice(s))? | ☐<br><br><br><br><br><br><br><br>☐ | ☐<br><br><br><br><br><br><br><br>☐ |  | **If NO, return FR to Draft for correction by the PO.**<br><br>See Return to Sender Guidance<br><br>Activities to be funded under assistance agreements must be appropriately funded, meaning that they must be consistent with the Agency's strategic plan and federal appropriations law.<br><br>**28A Related Reference Notes:**<br>**If NO, return FR to Draft for correction by the PO.** See Return to Sender Guidance |
| **30**. [**FR Sections B.5.a thru B.5.c.**] Has the PO documented compliance with the Environmental Results Order? | ☐ | ☐ |  | If NO, advise PO to enter a FR comment to provide additional information.<br><br>The FR responses to Section B.5.a and B.5.b should be "NO", and B.5.c. must always be "YES".<br><br>**NOTE-** B.5.c. must agree with the answer in Question No. 20 of this checklist. If not, you must resolve with the PO. |

|  | YES | NO | REFERENCES & NOTES |
|---|---|---|---|
| **31.** [FR Sections B.5. and B.5.d.] Has the PO documented that the Program Results Code (PRC) and project activities are consistent? | ☐ | ☐ | **If NO, return FR to Draft for revision by the PO.** See Return to Sender Guidance<br><br>The PO must address how the project fits under each Goal and Objective identified in the table in FR section B.5. |

|  | YES | NO | N/A |  |
|---|---|---|---|---|
| **32**. [**Section B.6.**] If Question No. 19 of this Checklist identified potential data use or collection activities that may warrant Quality Assurance (QA), has the Program addressed adequately the FR Question(s) including identifying the need for a Programmatic QA Term and Condition? | ☐ | ☐ | ☐ | **31.Related Reference Notes:**<br><br>If NO, follow up with PO to have them add a Comment to the FR to correct any improper responses and/or add the appropriate condition(s).<br><br>QA is the responsibility of Program Staff, however the GS must ensure that the proper terms and conditions are included in the award document if it applies. Here's additional guidance that can be shared with the Program Office if needed: Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance |
| **32A.** If QA applies, and the award exceeds $200,000 or is expected to exceed $200,000 (including all amendments) the Competency Policy applies. Has the Project Officer included the appropriate competency term and condition? See Competency FAQs Question 26. | ☐ | ☐ | ☐ | **31A. Related Reference Notes:**<br>If NO, follow up with PO to have them add a Comment to the FR to include the appropriate condition. |
| **32B.** If applicable has the PO added the required statement to the FR? See Competency FAQs Question 27<br><br>**32B NOTE** - This only applies to Continuing Environmental Programs with an approved Quality Management Plan<br><br>R2 has developed two checklists that POs can use to navigate QA & Competency Requirements. For Project Grants and CEPs. | ☐ | ☐ | ☐ | **31B. Related Reference Notes:**<br><br>If NO, follow up with PO to have them add a Comment to the FR to include the required statement.<br><br>**31A. & 31B. Reference Notes:**<br>Policy Notice 2013-G02 on Competency: https://work.epa.gov/sites/default/files/2024-09/pn_2013_g02.pdf |

**App.64**

| | YES | NO | N/A | |
|---|---|---|---|---|
| **33. [Section B.13]** If the workplan contains planned activities to collect identical information from 10 (ten) or more persons and the award will be either:<br><br>1. a Cooperative Agreement or;<br>2. a Grant Agreement when information collection is being undertaken at EPA's specific request; and/or will involve EPA specifically approving the collection of information or collection procedures.<br><br><br>Then the Paperwork Reduction Act applies. Has the PO included the proper Programmatic Term and Condition or indicated that they have obtained OMB approval prior to award? | ☐ | ☐ | ☐ | If NO, follow up with PO to have them add a Comment to the FR to correct any improper responses and/or add the appropriate condition.<br><br>For additional information see:<br>**GPI-99-01 Information Collection Requirements**<br><br>NOTE- Program must obtain required OMB clearance prior to the applicant initiating any work involving the survey or data collection. |
| **34. [FR Section B.14.]** In Question No. 19 of this Checklist did you identify potential work or travel outside the United States or its Territories?<br><br>**If NO, proceed to Question 35**<br><br>If YES has the PO:<br>1. Included NEPA 102(2)(f) as a Statutory Authority?<br>2. Addressed all the FR questions (B.14 thru B.14.d.) regarding OITA Clearance?<br><br>**NOTE-** As used here, foreign projects include grants, cooperative agreements, fellowships, and Interagency Agreements all or any part of which will be performed in a foreign country by (a) a U.S. recipient, (b) a foreign recipient, or (c) an international organization. Please note that foreign work includes travel of individuals to foreign countries under assistance agreements. Even a brief trip to a foreign country, for example to attend a conference, by itself requires OITA approval.<br><br>For further guidance see GPI 12-04 Award and Administration of Foreign Grants. | ☐<br><br>☐<br>☐ | ☐<br><br>☐<br>☐ | ☐<br><br>☐<br>☐ | **If the PO did NOT address all applicable requirements and/or included appropriate terms and conditions, return FR to Draft for revision by the PO.**<br>See Return to Sender Guidance<br><br>Reviewer must ensure that if the project contains any work or travel outside the United States that it has been properly approved by the Office of International Affairs and, if necessary, the State Department. OITA approval is required for travel to and contractual services or subawards performed in all foreign countries including Mexico and Canada. Puerto Rico, the Marianas, and U.S. territories are not covered by the requirement. Note also, if international activities are included in the Agreement, NEPA should likely be added as an authorizing statutory authority in section A.15.<br><br>See the Requirements for obtaining OITA Clearance<br><br>*Note: the Fly America Act term and condition is part of the General T&Cs so it never needs to be separately added* |
| **35. [FR Section B.15.]** Will Geospatial Data be created as part of the agreement?<br><br>If the PO answered YES to the FR question regarding geospatial information, verify with the PO whether Geospatial Data will be **created** as part of the agreement. | ☐ | ☐ | | If YES ensure that the PO included the National Programmatic Geospatial Term and Condition. If the PO did not include the T&C, then he/she must add a Comment to the FR including it.<br><br>If the PO answered NO to the FR, then no additional action by the Grant Specialist is necessary.<br><br>For additional guidance, refer to:<br>National Geospatial Data Policy (pdf) |

**App.65**

| | | | |
|---|---|---|---|
| **NOTE -** The use of GIS information does NOT require the use of Programmatic Term and Condition, however the creation of GIS data does require the National Programmatic Geospatial Term and Condition. | | | National Geospatial Data Procedures (pdf) |
| 36. **[FR Section B.16.]** Has the PO indicated that Homeland Security - Presidential Directive (HSPD) 12 requirement for Smart Card applies to this applicant? | ☐ | ☐ | If YES, ensure that the PO included the EPASS National Programmatic Term and Condition in the FR which pertains to HSPD-12. If the PO did not include the T&C, then he/she must add a Comment to the FR including it.<br><br>See: GPI 08-03 Personal Identity Verification and Smart Card Guidance for Assistance Recipients |
| 37. **[FR Section C.1, C.2. & C.3.]**<br>In C.1, did the PO properly indicate whether the application is recommended for funding through a competitive process?<br><br>**Complete the applicable section below (Competitive or Non-Competitive:**<br><br>**For COMPETITIVE Awards:**<br>Has the PO provided the required information in C.2.a. and C.2.b?<br>Has the proper documentation been attached in C.2.c?<br>It must, at a minimum, include:<br><br>☐ Competition Summary, including noting that the panel chair and all reviewers each signed conflict of interest forms, containing the following items:<br>• a general description of the type of projects solicited under the competition<br>• how many applicants applied and how many were deemed eligible<br>• how the evaluation and ranking was conducted by the review panel<br>• a list of the criteria the proposals were evaluated against (e.g., list the evaluation factors and their values from Section V of the announcement), and confirmation that the proposals were evaluated against the criteria and point distribution stated in Section V of the announcement<br>• Ratings and Rankings of all eligible applications<br>• Selection official decisions and rationale (including explicit discussions of any out of order selections and partial funding decisions) The Selection Official conflict of interest form may either be attached or referenced in the document.<br><br>Has the PO selected the correct type of competition in Section C.3?<br><br>**For NON-COMPETITIVE Awards:** Has the PO selected the appropriate Non-Competitive reason in Section C.2.? | ☐<br><br><br><br><br><br>☐<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>☐<br><br><br>☐ | ☐<br><br><br><br><br><br>☐<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>☐<br><br><br>☐ | **36.Related Reference Note:**<br>**If NO, then the FR must be returned to Draft for revision by PO.**<br><br>See Return to Sender Guidance<br><br>**COMPETED Awards Related Reference Notes:**<br><br>**If NO and/or if the PO did not properly and completely (no blanks are allowed) address the proceeding FR sub-questions, then the FR must be returned to Draft for revision by PO.**<br><br>Competition Policy<br><br>See Selection Documentation Guidance<br><br>**Reminder:** Most competitions are Open Competitions but some programs (e.g., Brownfields, Competitive DERA grants, Pollution Prevention, and State Wetlands Development Grants) require competition under statute or regulation. Simplified Competitions (competitions for $100,000 or less which are limited to a subset of the entire potential applicant pool) are not common, nor are Exempt Program competitions (competitions run for programs that didn't require them). Some programs (which would normally be required to compete their funds) have been granted an exemption under the competition policy. OGD maintains a list of these program exemptions at: https://usepa.sharepoint.com/sites/OARM/OGD/AAA/SitePages/Program-Exemptions.aspx<br><br>For a listing of Competition Codes for Competed awards, see chart on Page 2 in the Return to Sender Guidance<br><br>**NON-COMPETED Awards Related Reference Notes:**<br>**If NO and/or if the PO did not properly and completely (no blanks are allowed) address the proceeding FR sub-questions, then the FR must be returned to Draft for revision by PO.** |

**App.66**

| | | | |
|---|---|---|---|
| **C.2. Select the reason why the award was not competed under EPA Order 5700.5A1.**<br><br>Exempt from Competition Policy - 6.c<br>Exception from competition - 12.a<br>Exempted under Sections 6.b(7) or 7.a of Oct. 2002 Competition Policy<br>Waiver from Competition Policy under Section 20<br>Novation<br><br>**NOTE** -The proper choice made in C.2. by the PO will determine which subsections (if any) need to be completed, including approval dates and waivers/justifications.<br><br>Has the PO selected the correct reason for non-competition in Section C.3? | | | **Reminder:** For Non-CEP grants over $40,000 additional approvals and documentation are required for a Non-Competitive award, except for Novations (see Change of Recipient guidance in section 4.4.2 in the Grants Wiki).<br><br>For a listing of Non-Competition Codes for Non-Competed awards, see chart on Page 6 in the Return to Sender Guidance |
| **38. [FR Section D]** Based on a review of the **FR Budget Table**, address the following:<br><br>• **38A. Are the amounts shown in the cost categories in lines D.1 through D.11 correct? (they must match the award)**<br>• **38B. Does the amount in D.8 (Other) equal or exceed the sum of the amounts for Subawards (E.9.a) and Participant Support Costs (E.10.a)?**<br>• **38C**. Does the amount in line D.12 match the amount requested in the SF424 or any updates thereto?<br>• **38D**. Does the amount in Line D.13 equal the amount of the CURRENT action (not including EPA In-Kind support)?<br>• **38E**. Did the PO correctly answer the Fully versus Partial Funding question (FR Line D.14)? | ☐ ☐ ☐ ☐ ☐ | ☐ ☐ ☐ ☐ ☐ | While the GS conducts their own Cost Review, the GS must ensure that the requested and approved budget amounts are consistent between the PO Cost Review and the GS Cost Review.<br><br>The programmatic cost analysis must address all costs, except for Fringe and Indirect Costs. Those are the responsibility of the Grant Specialist and are not covered in the PO cost review.<br><br>The Total Approved Assistance Amount of the award does not appear in lines D.1 through D.14 of the FR budget but is available in Row I (in the Budget Worksheet) and should be populated to ensure the accuracy of the budget and cost share calculations.<br><br>I. Total Approved Assistance Amount<br><br>If t**he answers to 37A** or **37B** are NO, then the FR must be returned to Draft for revision by PO. Any other incorrect items may be fixed through comments.<br><br>See Return to Sender Guidance |
| **39**. **[FR Section E.1. & E.1.a.]** Has the Project Officer completed the appropriate cost review form and attached it to the Funding Recommendation (either in Section E.1.a. or Section M)? | ☐ | ☐ | If No, meaning the cost review is missing or is the wrong version, then the FR must be returned to draft.<br><br>Important note:  For CDS grants (program code CG), POs must use the project grant option of cost review form below. This is the only cost review form that captures the proper characterization of construction costs and current UGG requirements. Use of any other cost review form for these grants is reason to return an FR to draft. Cost Review Template For PROJECT OFFICERS - Continuing Environmental Program/Gap Or Project Grants (DOCM)<br><br>Errors in the proper form may be fixed by attaching a revised form in an FR Comment document.<br><br>See Return to Sender Guidance<br><br>If the Project Officer has attached a Cost Review for Part 35 grants, verify the eligibility for this Simplified Review with your answer in Question No. 15 of this checklist. If the answers to ALL questions are "Yes", then the Part 35 Cost Review can be used. If any of the |

**App.67**

|  |  |  |  | answers is NO, then the Project Grant Cost Review Template/Option must be used.

REMINDER: use of the combined CEP/Project Grant template is encouraged but optional except for CDS grants. Use of this form cannot be a reason for returning an FR to draft.

The PO Cost Review MUST address both EPA funds and Recipient Cost-share as applicable. In addition, EPA In-Kind support should be addressed and included in the requested & approved amounts. The PO Cost Review should NOT include Fringe Benefits or Indirect Costs.

Cost review templates and guidance, as well as indirect cost calculators are available here: https://intranet.epa.gov/ogd/cost_review/main/ |

|  | YES | NO | N/A | REFERENCES & NOTES |
|---|---|---|---|---|
| **40.** [**Section E.2.**] If applicable, has the PO completely and adequately addressed Pre-Award costs?<br><br>**REMINDERS for Pre-Award Costs:**<br>• **Must be included in the budget/work plan/SF-424 or revision thereto**<br>• **Must be allowable by regulations/statute/policy**<br>• **Must be approved by the Project Officer via the FR or revision thereto.**<br>• **If over 90 days, a justification is required in Question E.2.a of the FR or revision thereto.**<br>• **No justification is required for pre-award costs up to 90 days** | ☐ | ☐ | ☐ | If NO, advise PO to enter FR comment to provide additional information.<br><br>Ensure that the PO's answer(s) are consistent with your response and the guidance in Question No. 14 of this checklist.<br><br>Note: The pre-award condition should always be in the Grant-Specific Administrative T&Cs of an award. |
| **41**. [**Section E.3. & E.3.a.**] (Multiple Appropriation Grant) If applicable, has the PO provided a sufficient justification and an allocation table?<br><br>Multiple appropriations awards are those that include funds from more than one distinct appropriation code, except for awards combining new and carryover and/or recertified funds in the same program.<br><br>See the sample chart below which shows the FY22 STAG appropriation codes.  Even though all of these are under the major appropriation of STAG there are many separate programs within it. Combining funds from more than one program in a single award must meet the requirements of the multiple appropriations policy.  For example, combining funds from codes E2 with E2C and/or E2D are not multiple appropriations since they are all the same appropriation funds – but just a combination of new and carryover or recertified funds. But, if E2SD funds are added, the multiple appropriations policy is triggered. | ☐ | ☐ | ☐ | If NO, advise PO to enter FR comment to provide additional information.  Multiple Appropriation awards require 2 things:<br><br>1. A justification showing how ALL activities are eligible using each appropriation under the grant.<br><br>2. Allocation table showing the distribution by percentage among the various appropriations when the grant is fully funded.<br><br>See Multiple Appropriations Grants Policy Issuance 01-02<br><br>ALL activities must be eligible under each appropriation in a grant using multiple appropriations– see Section 4 of the Policy.<br>The major grant making appropriations are: STAG, EP&M, Superfund, LUST, and S&T. Multiple appropriation awards may include more than one of these in a single grant or more than one appropriation code within a single major appropriation. See the appropriation list in the Annual Advice of Allowance memo.<br><br>For further information on these see pages 7-11 and 7-12 for Multiple Appropriations Guidance in OCFO's Funds Control Manual |

**App.68**

| | | | |
|---|---|---|---|
| | State and Tribal Assistance Grants (STAG) | | |
| E1 | STAG Categorical Grants | | |
| E1 | STAG Categorical Grants Carryover (2nd year) | | |
| E1C | STAG Categorical Grants Carryover (BFY 2020 & Prior) | | |
| E1D | STAG Categorical Grants Recertified Funds | | |
| E1S3 | STAG - Harvey, Irma, and Maria Supplemental Carryover | | |
| E1S4 | STAG - BFY 2019 Disaster Supplemental Carryover | | |
| E1S7 | STAG ARP Act Supplemental Carryover | | |
| E1SDA | STAG CAT Grant - Bipartisan Infrastructure Suppl - Admin | | |
| E2 | STAG Clean Water SRF | | |
| E2 | STAG Clean Water SRF Carryover (2nd year) | | |
| E2SD | STAG CW Grant - Bipartisan Infrastructure Suppl | | |
| E2SDA | STAG CW Grant - Bipartisan Infrastructure Suppl - Admin | | |
| E2C | STAG Clean Water SRF Carryover (BFY 2020 & Prior) | | |
| E2D | STAG Clean Water SRF Recertified Funds | | |
| E2S2 | STAG Clean Water SRF Sandy Supplemental Carryover | | |
| E2S4 | STAG Clean Water SRF BFY 2019 Disaster Supplemental Carryover | | |
| E3 | STAG Drinking Water SRF | | |
| E3 | STAG Drinking Water SRF Carryover (2nd year) | | |
| E3C | STAG Drinking Water SRF Carryover (BFY 2020 & Prior) | | |
| E3D | STAG Drinking Water SRF Recertified Funds | | |
| E3S2 | STAG Drinking Water SRF Sandy Supplemental Carryover | | |
| E3S4 | STAG Drinking Water SRF BFY 2019 Disaster Supplemental Carryover | | |
| E3SD | STAG DW Grant - Bipartisan Infrastructure Suppl | | |
| E3SDA | STAG DW Grant - Bipartisan Infrastructure Suppl - Admin | | |
| E4 | STAG Special Programs | | |
| E4 | STAG Special Programs Carryover (2nd year) | | |
| E4C | STAG Special Program Carryover (BFY 2020 & Prior) | | |
| E4D | STAG Special Programs Recertified Funds | | |
| E4S5 | STAG USMCA Supplemental | | |
| E4S7 | STAG Special Programs ARP Act Supplemental Carryover | | |
| E4SD | STAG Spec. Projects - Bipartisan Infrastructure Suppl | | |
| E4SDA | STAG Spec. Projects - Bipartisan Infrastructure Suppl - Admin | | |
| E5 | STAG New Earmarks | | |
| E5C | STAG Earmarks (Program Project 51) | | |
| E9 | STAG Homeland Security Supplemental Carryover | | |

Also see PN-2022-G03: Funding Assistance Agreements with Infrastructure Investment and Jobs Act Appropriations and Other Appropriations

Resource Management Directive System Number: 2520-T1 -- Split-Funding with Multiple Appropriations

---

**42**. [**Section E.4.**] If applicable, has the PO completely and adequately addressed the EPA In-Kind contribution?

How EPA In-Kind should be reflected in the **Grant Award**: In the award funding table, In-Kind must not be in the first line, but must be shown exclusively in the second line.

EPA Amount This Action:

EPA In-Kind Amount:

In-Kind must be included in the appropriate cost category(s) for which the support is provided. Examples: EPA In-Kind contracts should be identified in the Contract category or EPA-provided equipment should be in the Equipment category.

In the award budget table, In-Kind must be included in Lines 11, 12, 14 and 15. NOTE- EPA In-Kind costs are subject to cost-share requirements.

11. Total (Share: Recipient 0.00 % Federal 100.00 %.)

* 12. Total Approved Assistance Amount

14. Total EPA Amount Awarded This Action

15. Total EPA Amount Awarded To Date

However, it will NOT be included in the fiscal table since this shows the funds obligated and made available to the recipient.

If NO, meaning the answers are incomplete (no blanks) or incorrect, advise PO to enter FR comment to provide additional information.
FR view:

E.4. Does the funding for this action include any EPA In-Kind Contribution?
Yes

E.4.a. Did the recipient request the contribution?
Yes

E.4.b. The savings were:
[ ]  Add

Selections for E.4.b.:
Remove • Time
Remove • Cost

E.4.c. What is the amount of the EPA in-kind contribution?
[ ]

EPA In-Kind contributions must be specifically requested by the applicant in the grant application package (or supplement to the application). We cannot award unrequested In-Kind support. Moreover, In-Kind support cannot be used to bypass the applicant's procurement requirements; there has to be a written justification demonstrating the cost-effectiveness and/or expediency for the federal government to procure the requested support. The PO must document whether there are "time" and/or "cost" savings and specifically identify the total amount of In-Kind support being provided.

It is important to note that In-Kind funding does not go to the recipient. It is NOT obligated as part of the grant. Instead, it is withheld and obligated locally by EPA Program and Contracts staff to procure goods and/or services for the recipient. It must be included in lines A.13 and D.12 but will not be included in D.13 in the FR:

*c A.13. EPA Funds Requested

---

**App.69**

| | | | |
|---|---|---|---|
| In the OMB view of an award, the difference is made clear. Here is an extract from the Notice of Award section for a grant with an obligated amount of $9,049,668 and EPA In-Kind of $185,400 (combined total of $9,235,068).<br><br>Based on your Application dated 09/06/2012 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $9,049,668. EPA agrees to cost share 54.60% of all approved budget period costs incurred, up to and not exceeding total federal funding of $9,235,068.<br><br>For more information see:<br><br>Internal Interim General Cost Review Guidance for EPA Grants Specialists and Project Officers | | | D.12. Total Requested Amount<br><br>\*D.13. Total Request To Fund Amt This Action<br><br>Recommendation: Some POs include a Grant-Specific Programmatic condition that identifies the amount(s) and purpose(s) of the EPA In-Kind support. This is not required but it makes it clear, especially when the In-Kind total is made up of more than one item. Here's an example:<br><br>**IN-KIND ASSISTANCE**<br>In accordance with the recipient's request, EPA will send $100,000 via EPA-Region 1 to NESCAUM for annual dues and $85,400 to the EPA national contract for technical support. |
| **43**. [**Section E.5.**] Referring to your review in Question 17 above, has the PO correctly and completely answered all questions to document compliance with Matching/Cost-share requirements?<br><br>Reminder: The "leveraging" term and condition is to be included in all competitive awards where the recipient proposed and was evaluated based on leveraging. If the leveraging included a voluntary cost-share or overmatch component, then the "voluntary cost-share or overmatch" term and condition must also be included in the competitive award.<br><br>**Reminder: Cost share percentages must be shown to two decimal places (e.g., 25.19% in both the FR and award documents.** | | | | If NO, meaning the answers are incomplete (no blanks) or incorrect, return FR to Draft for revision by the PO.<br>See Return to Sender Guidance<br><br>The GS must ensure that the PO's answers to the FR questions are complete and agree with the GS' analysis of cost-sharing in Question 17.<br><br>E.5. Is the recipient providing cost sharing under this agreement?<br>Yes<br><br>E.5.a. Cost sharing is:<br><br>E.5.b. What is the cost share percentage?<br><br>E.5.c. What is the MOE amount, if applicable?<br><br>Competition Guidance on Cost-share and Leveraging |
| 44. [**Section E.7**] Program Income: If applicable, has the PO completely and adequately documented the use of Program Income that will be generated under the agreement?<br><br>E.7. Is this project expected to generate program income?<br>Yes<br><br>E.7.a. How much program income is expected?<br>$0.00<br><br>E.7.b. Recommendation for the disposition of this income (see 2 CFR 200.307 or 2 CFR 1500.8):<br><br>Add to funds committed to the project by EPA and recipient and used to further eligible project or program objectives.<br>Use to finance the non-Federal share of the project or program.<br>Deduct from the total project or program allowable cost in determining the net allowable costs on which the Federal share of cost is based.<br><br>Permit fees are governmental revenue and not program income. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307 paragraph (f). Program income includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award | | | | If NO, meaning that answers are incomplete or incorrect, advise PO to enter a FR comment to provide additional information.<br><br>2 CFR 1500.8<br>2 CFR 200.1 and 200.307<br><br>**REMINDERS:**<br>• **The default use of program income for EPA awards is addition**.<br><br>• **Ensure that the PO included a grant-specific Programmatic Condition with disposition instructions consistent with FR section E.7.b.**<br><br>Brownfields Revolving Loans: recipients may use grant funding prior to using program income funds generated by the revolving loan fund. Recipients may also keep program income at the end of the assistance agreement as long as they use these funds to continue to operate the revolving loan fund or some other brownfield purpose as outlined in their closeout agreement. |

**App.70**

| | | | | |
|---|---|---|---|---|
| funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them. See also §200.407 Prior written approval (prior approval). | | | | If the recipient is proposing to use program income to finance the non-federal share (recipient cost-share) of the project, there must be a clear calculation for the expected amount and must be reflected in the budget (Application, FR and Line 13 of Award Document). |
| **45**. [**Section E.8.**] If applicable, has the PO provided disposition instructions for equipment to be acquired under the agreement?<br><br>E.8. Will equipment be acquired under this assistance agreement? (See 2 CFR 200.313)<br>Yes<br>E.8.a. When equipment is no longer needed for this project:<br>Add<br>Allow the recipient to continue to use it on this project or on other federally funded projects whether or not supported by Federal funds<br>Reserve EPA's right to transfer the title of the equipment to EPA or a third party when this project is complete<br>Allow the recipient to sell the equipment when it is no longer needed and reimburse EPA. Add the appropriate Term and Condition<br>Since this is a Superfund project, it is subject to specific disposal options (See 40 CFR 35.6345)<br>E.9. Are there Subawards proposed in the budget?<br><br>*Equipment* means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $10,000. | ☐ | ☐ | ☐ | If NO, advise PO to enter a FR comment to provide additional information and, if applicable, the required programmatic condition.<br><br>If there are funds budgeted in the FR for equipment (D.4. Equipment) then the answer to FR section E.8 must be Yes and the appropriate disposition choice selected.<br><br>If the instructions are for anything other than allowing the recipient to keep the equipment, a programmatic condition should be included that provides specific disposition instructions.<br><br>See 200.313 for more information.<br>If the budget contains items for less than $10,000 for equipment, you should verify that the recipient has a lower internal threshold for equipment defined in its policies. |
| **46**. [**FR Section E.9.**] If applicable, are **Subawards** appropriately characterized in the "Other" budget category of the FR?<br><br>E.9. Are there Subawards proposed in the budget?<br>Refer to GPI 16-01: EPA Subaward Policy and 2 CFR 200.1 for additional determination and information, if necessary. NOTE: Subaward costs should be allocated to the "Other" budget category and the budget narrative should specify the amount of subaward funding.<br>Yes<br>Because subawards are included in the project, Grants Policy Issuance 16-01: EPA Subaward Policy and its requirements must be adhered to which apply to both EPA and the Pass-through entity. A National Term and Condition (referenced in Appendix B of the Subaward Policy), which identifies the subaward management expectations referenced in Title 2 CFR 200, is already included for this award in the General Online Terms and Condition titled: "Establishing and Managing Subawards (modified 3/29/16)", which is found on the EPA internet site. Please address the following:<br>E.9.a. What is the Total Aggregate Value for all proposed subawards?<br>E.9.b. Is this a Clean Water SRF or Drinking Water SRF grant (which is exempt from this requirement), or have you included the Subaward Reporting Requirements (found in Appendix C of the Subaward Policy) as part of your performance reporting term and condition in Section F. of the Funding Recommendation?<br>Yes<br>*C E.9.c. Describe the activities to be implemented through subawards.<br>No subawards are included in this assistance agreement.<br><br>See Return to Sender Guidance | ☐ | ☐ | ☐ | For these questions, refer to the Subaward Policy (GPI 16-01) for specific guidance and additional information relating to Subawards.<br><br>**45.Related Reference Notes:**<br>**If NO, the FR must be returned to Draft for correction of the Budget Table and/or Cost Review and/or the Project Description and/or missing or incorrect answers in E.9.a. through c.**<br><br>Important Note: Subawards include loans under the Clean Water, Drinking Water, and Brownfields Revolving Loan Funds. For these programs E.9 must always be "Yes," and a value must be entered for E.9.a<br><br>Although NGGS requires that E.9.b contain a "Yes" answer whenever it appears, subaward Reporting T&Cs should not be added for the Clean Water or Drinking Water SRFs unless the recipient is awarding subgrants in addition to loans. These programs are exempt from the 2 CFR 200.332 subrecipient management requirements for subawards as provided in 2 CFR 1500.3<br><br>If any of the information is missing or incorrect in any of the sub-questions in **E.9.a. through c.**, the FR must be returned to draft. If the questions were answered correctly but the appropriate T&C was omitted, the condition may be added through a comment to the FR. |
| **46A. [FR Section E.9.a.]** Has the PO provided the expected aggregate total of all subawards? | ☐ | ☐ | ☐ | |
| **46B. [FR Section E.9b.]** Has the Project Officer included Subaward Reporting requirements (usually incorporated as part of the performance reporting condition)? | ☐ | ☐ | ☐ | |
| **46C. [FR Section E.9c.]** Has the Project Officer included a description of subrecipient activities that complies with the | ☐ | ☐ | ☐ | |

**App.71**

| | | | | |
|---|---|---|---|---|
| Data Quality Standards for project descriptions? See SOP-2021-G04. | ☐ | ☐ | ☐ | |
| **47**. [FR section E.10.] If applicable, are **Participant Support Costs** appropriately characterized in the "Other" budget category of the FR?<br><br>If YES, answer 47A<br>If NA, proceed to question 48 | ☐ | ☐ | ☐ | **46. Related Reference Notes:**<br>**If NO, the FR must be returned to Draft for correction of the Budget Table and/or Cost Review.**<br><br>See Return to Sender Guidance |
| **47A.** [FR section E.10A.] Has the PO provided the expected aggregate total of all Participant Support Costs?<br><br>*Participant support costs* means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (**but not employees or contractors/consultants**) in connection with conferences, or training projects (See 2 CFR 200.1<br><br>EPA Guidance on Participant Support Costs | ☐ | ☐ | ☐ | **46A. Related Reference Notes:**<br>No blanks are allowed if Participant Support Costs are applicable. If the amount is blank or incorrect, the PO must add a Comment to the FR showing the correct amount.<br><br>See also EPA's expanded definition of Participant Support Costs in 2 CFR 1500.1 covering rebates & subsidies |
| **48.** [FR Section F] All FRs require at least a reporting and a cybersecurity condition.<br><br>a.  Are the proper interim and final programmatic progress/performance reporting condition(s) added in the FR?<br><br>**NOTE-** All interim and final programmatic progress/performance reports must meet basic requirements outlined in 2 CFR 200.329 and EPA Order 5700.7A1 (Environmental Results)<br><br>b.  Is the appropriate version of the Cybersecurity T&C included? | ☐ (a)<br><br>☐ (b) | ☐ (a)<br><br>☐ (b) | ☐ (a)<br><br>☐ (b) | If NO, follow up with PO to add a Comment to the FR to include the appropriate condition(s).<br><br>If the award is applicable to one of the programs listed in Attachment A in GPI 11-03 State Grant Workplans and Progress Reports, the condition must require the that interim and final progress reports submitted by State recipients prominently display the three Essential Elements described in Section 6.0 of the Policy. |
| **49.** Is this an infrastructure or other award that requires NEPA clearance?<br><br>Additional references:<br>https://www.ecfr.gov/current/title-40/part-6/subpart-A: General Provisions for EPA Actions Subject to NEPA | ☐ | ☐ | | If Yes, there must be documentation attached to the FR showing that NEPA requirements have been satisfied. **The award may not proceed until NEPA clearance is documented.**<br><br>See: **Environmental Review Guide for Special Appropriation Grants Subject to the National Environmental Policy Act**<br><br>Note:  this reference is in the process of being updated. |
| **50.** Is this an award made under Assistance Listing 66.202: **Congressionally Mandated Projects?** | ☐ | ☐ | | POs must identify all such awards as earmarks in question B.4.a of the FR<br><br>*B.4.a. Is this assistance agreement a Congressional earmark project to a specific recipient?<br>Yes ⌄ |
| **VIII. MERIT REVIEW/OTHER FR REQUIREMENTS** | **YES** | **NO** | **N/A** | **REFERENCES & NOTES** |
| **51.** For non-competitive, discretionary grants (Column M in the Grants Crosswalk): Did the application pass the program office's merit review process for this grant program (e.g., is a merit review checklist or similar document attached to Section M of the FR, or has the GS been provided other written assurance from the PO.)? | ☐ | ☐ | ☐ | **If No, the award may not proceed until the merit review has been confirmed.**<br><br>Note that for conditionally approved PPGs, only the programs for which the workplans have been fully approved are required to have merit reviews |

**App.72**

| | | | |
|---|---|---|---|
| Note: merit review is also required for non-competitive grants made under competitive programs (e.g., grants of $25k or less or those based on a competition exception/exemption) | | | completed. The programs that are not yet approved must have merit reviews completed when the workplan the grant conditions are lifted. |
| 52. [FR section G, G.2.] Does this action require approval by the Senior Resource Official? | ☐ | ☐ | SRO Concurrence is required when the total costs are expected to be over $10 million for Continuing Environmental Programs and over $2 million for Project grants.<br><br>NOTE: if your SRO is the award official, separate approval of the FR is unnecessary since the SRO will sign the award. |
| 53. [FR PoP Tab] a. Has the PO adequately addressed the Place of Performance and does the affected area make sense in the context of what is occurring in the project?<br><br>b. Has a Primary Place of Performance been identified?<br><br>See: The NGGS Award Reference Guide for instructions on completing Place of Performance in NGGS. | ☐ | ☐ | **Place of Performance, including a Primary Place of Performance is required for all actions in NGGS and cannot proceed without it.**<br><br>**NOTE** - OMB requires EPA to report Place of Performance data for every grant within 30 days of award and the information is displayed for the public at www.USASpending.gov based on information pulled from the Award Document. In the absence of more precise information, the default response would be the address of the grantee. However, POs should make every effort to get more specific information on place of performance to enhance the accuracy of our data. This requirement applies to all grants even with benefits that are Statewide. POs working on Statewide awards should be encouraged to engage the grantee for primary location(s) for specific places of performance. |
| **IX. AWARD DOCUMENT REQUIREMENTS** | **YES** | **NO** | **REFERENCES & NOTES** |
| 54. Have you included a Funding Package Date in the award?<br><br>Funding Pkg. Date:<br><br>10/30/2020 | ☐ | ☐ | NGGS Funding Package Date field requirements:<br><br>• ALL actions must have a valid date entered in the NGGS "Funding Pkg Date" field within the "Award Document".<br><br>• This includes all monetary and non-monetary (such as time extensions, rebudgetings, etc.) actions.<br><br>• For some grant actions, the FPD is automatically populated, while other actions require manual entry. So be sure to check that this field is complete.<br><br>**If you are unsure of the FPD, OGD recommends the following:**<br><br>• For New grant actions, the FPD should be the receipt date of either the notification of the finalized Funding Recommendation or Commitment Notice(s), whichever is later.<br><br>• For Supplemental actions, the FPD should be the receipt date of either the notification of the finalized Funding Recommendation, Change Request or Commitment Notice(s), whichever is later. |

**App.73**

| | YES | NO | N/A | REFERENCES & NOTES |
|---|---|---|---|---|
| **55.** Is this a Congressionally Mandated Project, Superfund Technical Assistance Grant, or other award that includes special payment conditions?<br><br>If yes: | ☐ | ☐ | ☐ | If yes, choose or enter the appropriate payment T&C in the award, and complete the fields in Section 5 of the award shown below.<br><br>High Risk / Special Payment:<br>[Yes ▾]<br><br>Risk / Payment Description:<br>B I U S x₂ x² ✓ Iₓ  Font ▾ Size ▾ A▾ A▾<br>Source<br><br>Please see the Payment Approval condition in the Administrative Terms and Conditions. It requires EPA prior approval before each requested drawdown. |
| • Has the appropriate special payment condition been included in the award? | ☐ | ☐ | ☐ | |
| • Has the High Risk/Special Payment field and associated description been completed in Section 5 of the award? | ☐ | ☐ | ☐ | Grant Specialists must also remember to identify all congressional earmark projects in the Award under the special tracking code field. |
| • If the award is being made under Assistance Listing 66.202, has the Earmark Special Tracking Code been added in Section 5 of the award? | ☐ | ☐ | ☐ | Special Tracking Code:<br>[Earmark ▾] |

## X. NOTES/ADDITIONAL FOLLOW-UP ACTIONS NEEDED & ADD/UPDATE ANY TERMS AND CONDITIONS THAT MAY APPLY

**App.74**

| APPROVAL SECTION |
| --- |
| This Application for Federal Assistance and funding recommendation have been reviewed for administrative compliance with statutory, regulatory, policy and delegated authorities. Signature below indicates, in the reviewer's opinion, the application complies with the administrative requirements for award of assistance. |

| | |
| --- | --- |
| | |
| **Grants Specialist** | |

| INTERNAL CONTROL REVIEW (Optional) |
| --- |
| A Quality Control Review was made of this administrative review to ensure it complies with the statutory, regulatory delegated and policy requirements for award. Signature below indicates the reviewer supports the funding decision for this Application for Federal Assistance. |

| | |
| --- | --- |
| | |
| **Reviewer 1** | |
| | |
| **Reviewer 2** | |

**App.75**